443 F.2d 986
 UNITED STATES of America, Appellee,
v.
Lewis M. STRAUSS, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Ilario ZANNINO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Joseph P. BALLIRO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Peter LIMONE, Defendant, Appellant.
 Nos. 71-1036 to 71-1039.
 United States Court of Appeals, First Circuit.
 June 7, 1971.
 As Amended June 22, 1971.
 
 Francis J. DiMento, Boston, Mass., with whom DiMento & Sullivan, Boston, Mass., Robert V. Mulkern, and Fusaro & Fusaro, Worcester, Mass., were on brief, for appellants, Ilario Zannino and Peter Limone.
 David Berman, Medford, Mass., with whom Zamparelli & White, Medford, Mass., was on brief, for appellant, Lewis M. Strauss.
 Joseph J. Balliro, Boston, Mass., with whom Jay Merrill Forgotson, Boston, Mass., was on brief, for appellant, Joseph P. Balliro.
 Edward F. Harrington, Special Atty., Dept. of Justice, with whom Herbert F. Travers, Jr., U. S. Atty., and Sidney M. Glazer, Atty., Dept., of Justice, were on brief, for appellee.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 The four defendants in these cases were convicted by a jury of transporting goods in interstate commerce knowing the same to have been stolen, in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2.[1] The evidence adduced at trial indicated that defendants Balliro and Strauss actually transported the goods in question and that defendants Zannino and Limone aided and abetted the commission of the offense.
 
 
 2
 The relevant facts date back to the robbery of Cortell's jewelry store in Boston, Massachusetts, on March 24, 1966, by Erwin Soroko and Charles Lombardi. After the robbery, Soroko and Lombardi met Soroko's girl friend (now his wife) Joanne at a suburban shopping center. The three drove to Joanne's parents' summer cottage in Northwood, New Hampshire, where they hid the stolen jewelry. The next day Soroko went to see defendant Balliro, his "contact man," and asked him to arrange to sell the merchandise. Balliro procured one offer, which Soroko rejected as too low.
 
 
 3
 The two met again "around 1 o'clock" on the afternoon of April 7 at the Intermission Lounge, a Boston bar owned by Balliro. Soroko indicated that he was anxious to sell the jewelry, and offered Balliro "a piece" of the proceeds. Balliro then left and returned "around half an hour to an hour later" to report that "Larry" (defendant Zannino) was "interested in the merchandise." At Soroko's request, Balliro arranged a meeting with defendants Zannino and Limone at the Intermission Lounge about 3:00 or 4:00 that same afternoon. At this meeting it was agreed that Zannino's appraiser (defendant Strauss) would look over the merchandise. The next day Soroko, Balliro, and Strauss drove to the New Hampshire cottage. After some dickering, Strauss made an offer of $60,000, which was accepted, and the three men brought the jewelry back to Boston. Soroko received payments personally from Zannino and Limone on two subsequent occasions.
 
 
 4
 In late 1966 Soroko was convicted in state court and sentenced to ten to twenty years for his part in this robbery. In 1970 he pleaded guilty in federal court to interstate transportation of the jewelry and received a six-month sentence, to run concurrently with his state sentence. Soroko and his wife Joanne were the chief prosecution witnesses at the trial of the instant cases.
 
 
 5
 Defendants Zannino and Limone contend that they cannot be convicted under 18 U.S.C. §§ 2314 and 2 since there was no evidence that they knew the jewelry was hidden outside Massachusetts.[2] But by its terms — interstate transportation of goods "knowing the same to have been stolen" (emphasis ours) — the statute makes clear that the only knowledge required is that stolen goods are being transported. United States v. Kierschke, 315 F.2d 315 (6th Cir. 1953); United States v. Tannuzzo, 174 F.2d 177, 180 (2d Cir.), cert. denied, 338 U.S. 815, 70 S.Ct. 38, 94 L. Ed. 493 (1949); cf. Pugliano v. United States, 348 F.2d 902 (1st Cir.), cert. denied, 382 U.S. 939, 86 S.Ct. 390, 15 L. Ed.2d 349 (1965). Defendants cite Pereira v. United States, 347 U.S. 1, 74 S. Ct. 358, 98 L.Ed. 435 (1954), United States v. Sheridan, 329 U.S. 379, 67 S. Ct. 332, 91 L.Ed. 359 (1946), and Nicolopoulos v. United States, 332 F.2d 247 (1st Cir. 1964), where crimes of "causing" the interstate transportation of stolen checks and firearms have been held to require "knowledge on the part of the defendant, or, at least, reasonable grounds to know, that his conduct involves, or will result in, [interstate] commerce." Nicolopoulos, supra, 332 F. 2d at 248. The fact that courts faced with a provision of the statute involving the word "cause" may be said to have broadened the requirements of knowledge has no present relevance.
 
 
 6
 Zannino and Limone also suggest that Pereira and Nicolopoulos apply to them because, as aiders and abettors, they have been convicted of merely "causing" Strauss to transport the goods. This argument might have some merit had they been convicted under 18 U.S.C. § 2(b). See note 1 supra; United States v. Scandifia, 390 F.2d 244, 248-250 (2d Cir. 1968), vacated on other grounds sub nom. Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). However, the trial court instructed the jury under § 2(a), which, for purposes of culpability, places the aider and abettor in the shoes of the principal. As Judge Learned Hand explained in United States v. Peoni, 100 F.2d 401 (2d Cir. 1938), the traditional definition of aiding and abetting now incorporated in § 2(a) has
 
 
 7
 "nothing whatever to do with the probability that the forbidden result [will] follow upon the accessory's conduct; * * * [all that is required is] that he in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, that he seek by his action to make it succeed." Id. at 402.
 
 
 8
 Several days after the jury reached its verdict defendants moved for a new trial on the basis of newly discovered evidence. After a hearing, the trial court denied the motion. The newly discovered evidence consisted of an entry in a notebook kept by George Timmons, a Boston police officer, indicating that he had seen Soroko "about 3:30 p. m," on the afternoon of April 7, 1966, at a meat market located on Blackstone Street, Boston, owned by one Murray Alpert. This evidence directly contradicted Soroko's testimony at trial that at 3:30 p. m. on April 7 he was in the process of negotiating with Zannino and Limone at the Intermission Lounge, one mile away from Blackstone Street. Had this evidence been introduced at trial, it might have cast some doubt on the credibility of Soroko's testimony.
 
 
 9
 At the hearing, Officer Timmons testified that he went to Blackstone Street with Officer Brooks of the Boston Police Department and Lieutenant De Furia of the Massachusetts State Police sometime after attending a probable cause hearing involving Charles Lombardi, who had recently been apprehended for his part in the Cortell robbery. That hearing took place on the morning of April 7. At the meat market, the officers asked for Soroko, learned that Alpert was expecting him, and returned to their car to wait for him. Officer Timmons testified that he had no independent recollection of what time Soroko arrived and that he did not know whether he had made the notation in his notebook that afternoon or on the following morning. The only independent recollection of the incident came from Lieutenant De Furia, who testified that it occurred "anytime after 12 o'clock to 1:00, 1:30 at the latest." At the hearing both Soroko and his wife Joanne, who had accompanied him to the market, testified that they had arrived there sometime between 11:00 a. m. and noon. They stated that, after going to the market, they returned to Winthrop to feed Joanne's children during their noon lunch break from school.
 
 
 10
 The trial judge ruled that defense counsel's failure to offer this evidence at trial was not due to any serious lack of diligence on their part. As the Supreme Court has noted, courts have traditionally applied two somewhat different tests for determining whether newly discovered evidence warrants a new trial. See United States v. Johnson, 327 U.S. 106, 111 n.5, 66 S.Ct. 464, 90 L.Ed. 562 (1946). The majority rule, derived from the case of Berry v. Georgia, 10 Ga. 511 (1851), requires that the evidence "must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." Johnson v. United States, 32 F.2d 127, 130 (8th Cir. 1929); accord, United States v. Craft, 421 F.2d 693 (9th Cir. 1970); Hudson v. United States, 387 F.2d 331 (5th Cir. 1967), cert. denied, 393 U.S. 876, 89 S.Ct. 172, 21 L.Ed.2d 147 (1968); Anderson v. United States, 369 F.2d 11 (8th Cir. 1966), cert. denied, 386 U.S. 976, 87 S. Ct. 1171, 18 L.Ed.2d 136 (1967).[3] The Seventh Circuit rule, first announced in Larrison v. United States, 24 F.2d 82, 87-88 (7th Cir. 1928), is somewhat less stringent. Under the Larrison rule a new trial must be granted if, on the basis of the newly discovered evidence, "(a) The court is reasonably well satisfied that the testimony given by a material witness is false [and] (b) That without it the jury might have reached a different conclusion." Id. at 87; accord, Gordon v. United States, 178 F.2d 896, 900 (6th Cir. 1949). By "false" is meant deliberately false or "false swearing." See United States v. Johnson, 142 F.2d 588, 592 (7th Cir. 1944). The Second Circuit appears to have adopted the practice of testing the evidence against both standards, see United States v. Miller, 411 F.2d 825, 830 (2d Cir. 1969); United States v. Lombardozzi, 343 F.2d 127 (2d Cir.), cert. denied, 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702 (1965), before refusing to grant a new trial.
 
 
 11
 At the conclusion of the hearing the trial judge made a finding of fact that "the episode at the meat market most probably occurred between 12 and 1 o'clock." In effect, he concluded that he believed the testimony of the only officer who had a direct recollection of when the incident occurred. This finding is supported by Timmons' testimony that it was often his practice not to make entries in his notebook until the following day.[4] The trial judge also concluded that the introduction of the notebook entry would not "probably produce an acquittal." Berry v. Georgia, supra. He noted that Soroko had been subject to "scathing cross-examination" at trial and, although his testimony was corroborated in only minor respects, it nevertheless had the "ring of truth" in all its essential particulars.[5]
 
 
 12
 Thus, a new trial is not warranted here under either of the traditional tests discussed supra. The Larrison rule is inoperative since the trial court concluded that Soroko's trial testimony was not false. The record amply supports both that finding and the court's evaluation of the newly discovered evidence in light of the Berry v. Georgia standard. In a case such as this, where the overriding question is the possible impact of newly discovered evidence on the credibility of a key prosecution witness, we must affirm the findings of the trial court so long as there is evidence to support them. United States v. Johnson, supra, 327 U.S. at 111-112, 66 S.Ct. 464.
 
 
 13
 At the sentencing, the trial judge stated that he based his decision to sentence defendants Zannino and Limone to seven years, rather than five, on reputation testimony presented before two Senate committees to the effect that they are prominent members of a criminal syndicate in the Boston area. The Supreme Court has held that a sentence based on an "extensively and materially false" foundation which the defendant had no opportunity to correct cannot stand. Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). However, it is also well established that the sentencing judge may properly consider hearsay evidence regarding a defendant's "past life, health, habits, conduct, and mental and moral propensities." Williams v. New York, 337 U.S. 241, 245, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949); United States v. Doyle, 348 F.2d 715, 721 (2d Cir.), cert. denied, 382 U.S. 843, 86 S.Ct. 89, 15 L. Ed.2d 84 (1965). Although the judge failed to articulate why he thought this evidence warranted an additional two years, we note that membership in a criminal syndicate is clearly relevant to questions of corrigibility and likelihood of reformation in a short period of time. See generally Williams v. New York, supra, 337 U.S. at 247-250, 69 S.Ct. 1079. We also note that the evidence in question was not idle gossip but sworn testimony presented in the course of formal congressional investigations. And, both defendants and their counsel were given an opportunity to attempt to rebut this evidence. Cf. Williams v. Oklahoma, 358 U.S. 576, 583, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); Verdugo v. United States. 402 F.2d 599, 613-16 (9th Cir. 1968) (Browning, J., separate opinion), cert. denied sub nom. Turner v. United States, 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1970).
 
 
 14
 Defendant Strauss takes the position that the trial court should have directed a verdict of acquittal on the ground that the government's case was based almost entirely on the uncorroborated testimony of an accomplice. But it is well established that acquittal must be directed in this type of case only if the accomplice's testimony is "incredible or unsubstantial on its face." United States v. Brooks, 422 F.2d 367, 368 (9th Cir. 1970); Tillery v. United States, 411 F.2d 644, 647 (5th Cir. 1969). This is not such a case.
 
 
 15
 Defendants Zannino and Limone argue that the court erred in refusing to give a cautionary instruction regarding the testimony of Joanne Soroko because she too was an admitted accomplice. Technically there was no evidence that Joanne aided and abetted the commission of the crime of interstate transportation, but, inasmuch as she admitted to being an accomplice to several robberies performed by her husband, the instruction would better have been given.[6] We conclude that this error was harmless, however, since an adequate cautionary instruction was given regarding Erwin Soroko and much of that instruction referred to the other witnesses as well. We also note that Joanne's testimony generally concerned peripheral matters and was not essential to the government's case.
 
 
 16
 We deal summarily with defendants' remaining contentions. Although it was improper for the prosecutor to suggest in his concluding statement that the defendants are members of a "criminal element," the judge corrected the error by explaining to the jury that the statement was intended to refer to the prosecution's own witness Soroko, not to the defendants. With regard to the testimony before the grand jury, the defense has shown no abuse of discretion in the court's order that only the testimony of Soroko and Lombardi be revealed. See generally Dennis v. United States, 384 U.S. 855, 868-875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Defendants also argue that the jury should have been instructed that, if two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, the jury should adopt the one of innocence. While such an instruction would have been proper, McCoy v. United States, 169 F.2d 776, 785-786 (9th Cir.), cert. denied, 335 U.S. 898, 69 S.Ct. 298, 93 L.Ed. 433 (1948), there was no error in the judge's failure to give it inasmuch as he gave the "hesitate to act" test expressly approved by the Supreme Court. Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). Finally, the judge's statements to the jury regarding their hotel accommodations merely showed solicitude and concern for their well-being and had none of the dangers of possible coercion inherent in a Tuey instruction. See Commonwealth v. Tuey, 62 Mass. (8 Cush.) 1 (1851).
 
 
 17
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 18 U.S.C. § 2314 provides in relevant part:
 "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; * * *
 "Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. * * *"
 18 U.S.C. § 2 provides:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."
 
 
 [2]
 Defendant Strauss makes this same argument. Although there was some evidence from which the jury could infer that Strauss knew he had crossed into New Hampshire, the judge took that issue from the jury by instructing them that knowledge that a state line had been crossed was not required. As we indicate in the body of this opinion, we are in accord with the trial court's ruling on this issue
 
 
 [3]
 We note that, even those circuits that purport to follow the strict Berry v. Georgia rule have failed to adhere to it in close cases. In Newsom v. United States, 311 F.2d 74, 79 (5th Cir. 1962), where the court of appeals was of the opinion that the evidence supporting defendant's conviction was weak, the district court's refusal to order a new trial was reversed on the ground that "[a]nother jury may reasonably find [the newly discovered evidence] sufficiently credible to raise a reasonable doubt as to * * * the defendant's guilt." And in Mejia v. United States, 291 F.2d 198 (9th Cir. 1961), where the newly discovered evidence consisted of an alibi witness, the court reversed because the jury "might" come to a different conclusion in light of the new evidenceSee also Griffin v. United States, 336 U.S. 704, 708-709, 69 S.Ct. 814, 93 L.Ed. 993 (1949). Thus, the Berry rule is apparently not applied where the new evidence casts substantial doubt on defendant's guilt. In the instant case, however, it is clear from the trial court's findings following the hearing that the new evidence cast no such doubt. See discussion infra.
 
 
 [4]
 We note that, although Timmons testified that he observed Soroko's car for approximately thirty minutes, only the first three digits of the license plate number were recorded in the notebook. This evidence lends additional support to the conclusion that the notation was not made at the time the incident occurred
 
 
 [5]
 As the court noted, if Soroko had visited the meat market between 12:00 and 1:00, he could not possibly have made it back to the Intermission Lounge from Winthrop by 1:00. The court pointed out, however, that the evidence at trial also suggested that Soroko had arrived at the Lounge later than his testimony indicated. The court inferred that the jury had probably concluded that Soroko's testimony was inaccurate as to the precise times of day but that the events to which he had testified were essentially accurate. We note that, even if Soroko had not arrived at the Intermission Lounge until 2:00, there was ample time for him to speak with Balliro, wait for an hour, and then meet with Zannino and Limone before the end of the afternoon
 
 
 [6]
 The trial court based its refusal to give this instruction in part on defendants' failure to put their request for it in writing. But that is not a valid basis for refusal in this case since the judge had indicated before the written requests were submitted that he intended to give the instruction and made clear afterwards that he had given it full considerationSee Fed.R.Crim.P. 30; Hull v. United States, 324 F.2d 817, 824 (5th Cir. 1963).