**UNITED STATES of America,**
**Appellee,**

v.

**Frank J. MICELI, Defendant, Appellant.**

**No. 71-1080.**

United States Court of Appeals,
First Circuit.

July 14, 1971.

Francis J. DiMento, Boston, Mass., orally, David Berman, John F. Zamparelli, Victor J. Garo and Zamparelli & White, Medford, Mass., on brief, for appellant.

Craig M. Bradley, Atty., Dept. of Justice, with whom Herbert F. Travers, U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

The defendant was charged in Count II of a three count indictment with vio-

lations of 18 U.S.C. § 2314.[1] Other defendants were charged in Counts I and III but this defendant was the only one charged in Count II.[2] This count alleged that on or about October 8, 1967, the defendant with fraudulent intent transported ten counterfeit International Telephone and Telegraph bonds with a face falue of $1,000 each, from Newark, New Jersey to Boston, Massachusetts, knowing the said securities to have been counterfeited. The defendant's case was severed from those of the other defendants and, after a trial by jury, he was found guilty as charged.

The principal witness against this defendant as well as against the defendants in the Count I trial was an alleged accomplice named Vincent Teresa.[3] He testified that in early October 1967 he placed a telephone call in Boston to the defendant in New Jersey and asked him if he could obtain some counterfeit bonds. The defendant suggested that Teresa call him back later that day. Upon doing so, defendant told him that he had obtained some bonds and would fly them to Boston the next morning, which he did. Teresa and Mondovano[4] picked up the defendant at Logan Airport in Boston the next morning. The trio went to a restaurant where the defendant gave the other two, fifty counterfeit IT&T bonds with a face value of $1,000 each. It was agreed that the defendant would receive 20% of the proceeds of the sale of these bonds, which percentage Teresa agreed he would de-

liver to the defendant in New Jersey. After driving the defendant back to Logan Airport on the same day, Teresa and Mondovano went to Lynn, Massachusetts, and delivered the counterfeit bonds to one Al Grillo, who ran a Ford agency there. The evidence further shows that within the next few days Grillo took ten of these bonds, along with certain other bonds,[5] to a Boston attorney named Sriberg, who on October 9 pledged them to the New England Merchants National Bank as security for a $19,500 loan. Sriberg endorsed the bank's check for $19,500 and gave it to Grillo the same day. Grillo later showed this check to Teresa and upon cashing it gave him $19,000. As agreed, Teresa took $9,000 to New Jersey and gave it to the defendant.

■ There was further testimony that on October 23, 1967, Sriberg got an additional loan of $6,500 from the bank on the same collateral, gave the bank his personal check for $4,000 and obtained a cashier's check for $10,500. That day, he endorsed this check to Grillo who, some time later, gave Teresa an additional $7,000 or $8,000.

Defendant argues that he should have had a directed verdict of acquittal because the government's case was based on the uncorroborated testimony of Teresa, an admitted accomplice. It is well settled in this circuit that such testimony is sufficient for conviction. United States v. Strauss, 443 F.2d 986 (1st Cir.,

1. "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; * * *
   " * * * *
   "Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

2. Three of the four defendants named in Count I were tried two days before the instant defendant and were found not guilty of transporting forty-three counterfeit Standard Oil Company of California bonds from Brooklyn, New York to Lynn,

Massachusetts. The fourth defendant named in Count I (Mondovano), who was also the sole defendant in Count III, pleaded guilty. Mondovano figured prominently in the trials of both Counts I and II, as did several others who were not indicted.

3. The testimony in the Count I trial is also part of the record in the instant case.

4. See note 2, supra. Teresa testified that Mondovano was a partner with him in this transaction.

5. From the record of the Count I trial it is clear that the "other bonds" were the Standard Oil bonds involved in Count I. See note 2, supra.

1971); Benedicto-Lebrón v. United States, 241 F.2d 885, 887 (1st Cir.), cert. denied, 354 U.S. 911, 77 S.Ct. 1298, 1 L. Ed.2d 1429 (1957). Next, defendant strongly contends that, even if we do not accept his first contention, "there comes a point when the witness' qualifications are so shoddy that a verdict of acquittal should [be] directed." Lyda v. United States, 321 F.2d 788, 795 (9th Cir. 1963), and that this is such a case. In this connection he points to the fact that Teresa testified that he was a thief by occupation, that he admittedly perjured himself in at least one other case, that he made an advantageous arrangement with the government for himself and his family in return for his testimony, and that the record shows he had a long history of criminal convictions. But as we stated in *Strauss*, supra, "* * * it is well established that acquittal must be directed in this type of case only if the accomplice's testimony is 'incredible or unsubstantial on its face.'" Although Teresa's character and reputation appear to be more blemished than that of the accomplice in *Strauss*, his testimony in this case was more consistent. Teresa's credibility was a matter for the jury, and we note that on at least three occasions the trial judge instructed the jury that, because Teresa was an admitted accomplice, his testimony must be scrutinized carefully. If, despite his character and reputation, the jury believed Teresa's testimony, as quite obviously it did, there was ample evidence to support a verdict of guilty, and the defendant was not entitled to a directed verdict of acquittal.

■ Following his conviction, the defendant moved for a new trial on the ground that there was an inconsistency between Teresa's testimony in the instant case and his testimony in the earlier Count I trial in which he was also a witness for the government. It should be noted that, even though defendant's attorney was in the courtroom during the Count I trial and had the transcript of that trial before him during the instant case, he did not raise this point during trial. From our examination of the record we fail to see the inconsistency complained of, and we think the trial court properly denied the motion.

■ Defendant also contends that the indictment is defective because, although it charges that the defendant transported counterfeit securities across state lines, the government admitted that it did not know whether there were genuine bonds in existence bearing the same numbers. From this, he argues that the securities. were forged rather than counterfeited.[6] Here the bonds were clearly counterfeit. They were imitations of genuine IT&T bonds. The record shows that they were compared with a genuine IT&T bond which was introduced in evidence. Also, a representative of the bank note company that printed the bonds for IT&T produced a specimen bond and testified that the IT&T bonds in question in this case were counterfeit. The answer to defendant's contention is simply that a counterfeit bond refers to a copy of a *type* of bond, not a particular bond, with a particular serial number. Otherwise the government would be required to call in all genuine currency in order to prove counterfeiting of any given ten dollar bill.

■ Next, the defendant complains about the following instruction which the trial court gave to the jury:

"In a criminal case, as in every case, the judge gives the jury instructions of law and if he makes a mistake an appeal lies to a higher court, but you are required to follow the judge's instructions of law."

Although he did not object to this instruction at the time he now claims that it was plain error, relying upon United

---

6. A counterfeit is an imitation of the real thing, whereas a forgery involves false making or material alteration. *See, e. g.*,

State Bank of Poplar Bluff v. Maryland Casualty Co., 289 F.2d 544, 547, 548 (8th Cir. 1961).

States v. Fiorito, 300 F.2d 424, 427 (7th Cir. 1962). That case is clearly distinguishable. The *Fiorito* instruction implied that the jury's factual determination would be reviewed on appeal and prejudicially diluted the jury's responsibility for the facts. Such is not the situation here. We find nothing wrong with this instruction which is often given by federal trial courts. It merely indicated to the jury that it had no responsibility as to questions of law.

Defendant's remaining objections stem from remarks made by the prosecutor during his summation to the jury.

■■ After the government's closing argument the defendant objected as follows:

"* * * [The government] referred to hostility [between Teresa and Miceli]. There is no evidence of hostility. I refer to the fact that there is no burden on the defendant to show hostility or any other factor, that he can rely on his innocence throughout the trial and leave the burden of proof to the Government. * * *"

The government had stated that there was "no testimony concerning any hostility between Mr. Miceli and Mr. Teresa, no testimony regarding any motive" as to why Teresa should lie about Miceli. It also pointed out that the defendant had not cross-examined Teresa with regard to any hostility. Both of these statements are true. Defendant concedes that he could have cross-examined Teresa to show that the latter had a hostile motive for implicating him. Defendant's counsel did not do so, however, for fear that Teresa's denial of hostility would stand unless defendant testified, and defendant's trial strategy was not to testify. Of course, his failure to take the stand may not be commented upon by the government, for that would "[cut] down on the [fifth amendment] privilege by making its assertion costly." Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). Yet the failure to produce evidence other than the accused's testimony may be given its natural implications, so long as it does not focus indirectly on his silence. United States v. Cotter, 425 F.2d 450, 452 (1st Cir. 1970). There was no such focussing here. *Compare* 8 Wigmore, Evidence § 2273 (McNaughton rev. 1961), *and* Morrison v. United States, 6 F.2d 809, 811 (8th Cir. 1925), *with* Linden v. United States, 296 F. 104 (3d Cir. 1924). If defendant believed, as he argues, that he and Teresa had a longstanding antipathy toward each other, defendant cannot say, as he endeavors to, that he did not dare cross-examine Teresa lest he, untruthfully—according to counsel—deny hostility and embarrass defendant for not taking the stand. Defendant cannot make such affirmative use of his fifth amendment right not to testify. *Cf.* United States v. Cotter, *supra*. Moreover, unlike *Linden, supra*, the instant case exemplifies a situation where proof of a fact (hostility) is *not* limited to the defendant's personal knowledge and thus such comment by the prosecution is not reversible error. Defendant's reliance on Kitchell v. United States, 354 F.2d 715 (1st Cir. 1965), cert. denied, 384 U.S. 1011, 86 S. Ct. 1970, 16 L.Ed.2d 1032 (1966), is misplaced. In that case, the prosecution had sought to base a positive inference of acquaintance upon a total absence of such evidence. Here, the prosecutor's comments as to lack of any testimony of hostility accurately reflected the state of the evidence. *Kitchell* would have been more pertinent if the defendant had sought to argue that a positive inference of hostility could be drawn despite the absence of evidence of hostility.

■ Defendant further complains that the government said in its closing argument that he was Teresa's "friend." He argues that picturing him as one who was more than Teresa's mere acquaintance increased the weight which the jury would accord Teresa's accusations. Even assuming that the prosecution overstated the evidence, it is clear from the record that the defendant failed to make a specific objection to the

use of the word "friend." His objection was as follows:

"I would like to draw the Court's attention to the fact that [the government] referred to the fact that Mr. Miceli knows Mr. Teresa. There is no evidence of that in this case. The evidence was that Mr. Teresa said he knew Mr. Miceli. There is a big difference in connection with credibility."

This objection only went to the weight to be accorded Teresa's statement that he knew the defendant. Teresa had testified that he had known defendant for "years and years, maybe 15." Depending on how this testimony was given, it could mean absolutely nothing about a friendly relationship or could mean quite a bit. This ambiguity illustrates why it is necessary to inform the court of such matters for remedial clarification. Given that the defendant made six different objections at the close of the government's argument, his failure to focus on the use of the word "friend" waives his right to complain of it here. Fed.R. Crim.P. 51. Moreover, the use of the term "friend" was not so egregious that, even in the context of the instant case, a proper instruction by the trial court could not have corrected the problem. United States v. Stamas, 443 F.2d 860 (1st Cir., 1971).

 Finally, defendant objected to a statement in the government's closing argument that Teresa had made an arrangement with the government to testify "truthfully" concerning the transaction in which he was involved. If this remark was intended as an expression of the prosecutor's personal opinion about the veracity of Teresa's testimony, it violated the rule in this circuit that the prosecutor cannot bolster his case by "testifying." *See* United States v. Stamas, at 862; Patriarca v. United States, 402 F.2d 314, 320–321 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). We have searched the

record carefully and do not find that the defendant objected to this remark at trial. The remark fell short of plain error since in context the prosecutor may merely have intended to suggest that the bank records and other corroborative evidence showed that Teresa, although an admitted perjurer, told the truth regarding these transactions. A timely objection would have made possible a clarifying instruction from the trial judge.

Affirmed.

ALDRICH, Chief Judge (concurring).

I agree that the opinion is correct, but I cannot forbear remarking that defendant's brief, containing scurrilous remarks, exaggeration of what its cases hold, an attempt to manufacture inconsistency by drawing an inference, and an argument built upon factual assertions not in the record, warrants, I believe, a far less considerate opinion.