**UNITED STATES of America,
Respondent,**

v.

**Chauncy GRAY, Petitioner.**

No. 92–20301.

United States District Court,
W.D. Tennessee,
Western Division.

May 31, 2001.

Chauncy Gray, Clayton Robinson, FCI–Forrest City, Forrest City, AR, Pro se.

Linda N. Harris, U.S. Attorney's Office, Memphis, TN, for U.S. Attorneys.

## ORDER GRANTING PETITIONER'S MOTION FOR A NEW TRIAL

DONALD, District Judge.

Petitioner, Chauncy Gray, filed a motion for a new trial under Federal Rule of Criminal Procedure 33. Petitioner contends that the government, through the actions of Officer Richard Borgers ("Borgers") and his alleged agent, Delbert Delano Brooks ("Brooks"), knowingly, intentionally, and willfully induced Shelly McCaster ("McCaster") to testify falsely against Petitioner during Petitioner's December 1994 trial. Even if the government did not actually know McCaster's testimony was false, Petitioner argues that it should have known. In addition, because the asserted perjury was allegedly material to Petitioner's conviction, Petitioner maintains that he is entitled to a new trial irrespective of whether the government knowingly procured perjured testimony from McCaster. Finally, Petitioner argues that the Western District of Tennessee's nearly four-year delay in deciding his motion for a new trial constitutes a denial of due process under the Fifth Amendment and that his conviction should be set aside. For the following

reasons, the Court grants Petitioner's motion for a new trial based upon a denial of due process.

## I.  Background Facts

Following a five-day trial in December 1994, a jury convicted Petitioner, Alvin Gray,[1] and Austin Webb ("Webb") with conspiring to possess with the intent to distribute seven kilograms of cocaine in violation of 21 U.S.C. § 846.[2] The trial centered upon a reverse-sting operation conducted by the United States Drug Enforcement Agency on February 4 and February 5, 1991. During the trial, McCaster testified against Petitioner, stating that he had purchased drugs from Petitioner on numerous occasions in 1991. The government presented McCaster's testimony to rebut Petitioner's statement that Petitioner had not sold drugs since his release from prison in 1988. On March 27, 1995, the Court sentenced Petitioner to 264 months incarceration to be followed by five years of supervised release.

On March 30, 1995, Petitioner filed a notice of appeal to the Sixth Circuit. On June 17, 1996, the Sixth Circuit affirmed Petitioner's conviction and sentence.[3] *See United States v. Gray*, No. 95–5521, 1996 WL 338657 (6th Cir. June 17, 1996). On April 8, 1996, while Petitioner's appeal was pending, Petitioner filed a *pro se* motion

---

1. Alvin Gray is Petitioner's brother.

2. The Western District of Tennessee originally tried Petitioner, Alvin Gray, and Webb in September 1994, but that trial ended in a mistrial.

3. The Court of Appeals determined that there was sufficient evidence of a conspiracy to support Petitioner's conviction, that Petitioner was not entitled to an entrapment instruction, that the drug transactions testified by Shelly McCaster and Jessie Windom were relevant

conduct for the purposes of sentencing, that it was not an abuse of discretion to exclude evidence of alleged harassment by the Memphis Police Department, and that the testimonies of Alvin Gray, Jessie Windom, and Shelly McCaster were not inadmissible character evidence in that they were introduced for the limited purpose of rebutting Petitioner's testimony that he did not deal drugs after being released from a sentence for a prior conviction. (July 29, 1996 Order for a New Trial at 1.)

for a new trial with the Western District of Tennessee. Petitioner offered the following two grounds for a new trial: (1) the United States failed to disclose alleged impeachment evidence as to Alvin Gray, who testified against him at trial; and (2) the United States knowingly presented the false testimony of McCaster and Jessie Windom ("Windom"). On July 29, 1996, United States District Judge Jon P. McCalla concluded that Petitioner failed to establish that the impeachment evidence concerning Alvin Gray was favorable to Petitioner. (July 29, 1996 Order for a New Trial at 5). In addition, Judge McCalla found that Petitioner had not identified any newly-discovered evidence suggesting that the United States presented testimony from Windom that the government knew or should have known was false. (July 29, 1996 Order for a New Trial at 7). Nevertheless, Judge McCalla decided to conduct a hearing regarding McCaster's testimony, because Brooks's sworn statements created an issue of fact concerning whether the United States presented testimony from McCaster that it knew or should have known was false.

Judge McCalla held hearings on October 31, 1996, January 17, 1997, February 14, 1997, February 21, 1997, April 17, 1997, and May 12–13, 1997. On August 31, 2000, Judge McCalla recused himself from the case, and the case was reassigned to this Court. The Court makes a number of findings based on the transcripts of the 1996 and 1997 hearings without the benefit of observing the demeanor of witnesses for the purposes of credibility.

During the early 1990s, a task force comprised of members of the United States Drug Enforcement Agency and the Memphis Police Department ("Task Force") began to suspect that Petitioner and Alvin Gray were dealing in illegal drugs. At that time, Petitioner owned and operated a used car lot called California Cars. On twelve separate occasions between 1991 to July 13, 1992, the Task Force had obtained information on Petitioner, but not sufficient to bring charges.

The Task Force noticed Brooks frequenting California Cars, and recognized him as a prior felon. Following his felony conviction in the late 1980s, Brooks had been deported, yet had returned illegally to the United States. Although the Task Force's surveillance did not indicate any kind of drug dealing between Brooks and Petitioner, (Tr. May 12, 1997 at 146), the Task Force believed that Brooks might possess some helpful information about Alvin Gray and Petitioner. Seeking cooperation in their efforts to arrest Alvin Gray and Petitioner, the Task Force, with the assistance of the United States Immigration and Naturalization Service ("INS"), arrested Brooks on illegal immigration charges at a coffee shop on July 13, 1992. The Task Force took Brooks to the Germantown police precinct and later to a Hampton Inn hotel, where he agreed to cooperate with the Task Force in its effort to arrest Alvin Gray and later, Petitioner.[4] Brooks worked with the Task Force until he was arrested in the Fall of 1993 for conspiring to distribute one kilogram of cocaine.

Soon after his incarceration in late 1993, Brooks called Borgers, trying to broker a means to reduce his jail time and remain in the United States. (Tr. April 17, 1997 at 16). Borgers allegedly told Brooks that Brooks would have to do something from the inside before Borgers would post a

---

4. Brooks described his trip to the precinct and the Hampton Inn as a "kidnaping." Bor-

gers testified that Brooks went voluntarily.

bond to get him out of jail. (Tr. April 17, 1997 at 19). Brooks testified that Brogers was specifically interested in obtaining information that would convict Petitioner. In response, Brooks allegedly informed Borgers that it would be "very difficult for me to get [Petitioner]," because "[Petitioner] was not doing no kind of drugs in the street like [Borgers] thought." (Tr. April 17, 1997 at 19). According to Brooks, Borgers told him that if he could get Petitioner, the government would permit him to stay in the country. (Tr. April 17, 1997 at 19.) Conversely, Borgers testified that Brooks was never promised that he could stay in the United States. (Tr. May 12, 1997 at 133.) Borgers stated that an INS official explained to Brooks that he would have to be deported and that there was nothing they could do except give him a temporary work visa while he was cooperating with the Task Force.

After a period of incarceration, Brooks allegedly "inform[ed] Mr. Borgers that I had something in mind that probably could work [convicting Petitioner] if he approved it, . . . that I have someone that was willing to work with me and work with him." (Tr. April 17, 1997 at 25). In a later conversation, Brooks told Borgers that McCaster, another inmate at Mason, would be willing to testify against Petitioner. McCaster called Borgers, and Borgers went to Mason to interview McCaster alone.[5] The prison's records show that Borgers met with Brooks on October 11, 1993, and with Brooks and McCaster, separately, on October 25, 1993.

McCaster testified against Petitioner in his December 1994 trial, which resulted in Petitioner's conviction for conspiring with the intent to distribute cocaine. Eventually, Petitioner was incarcerated in the same facility as Brooks, where Brooks told Petitioner of his involvement with Borgers and McCaster. (Tr. April 17, 1997 at 47.) Petitioner filed a motion for a new trial, and Judge McCalla conducted hearings in 1996 and 1997.

James Earl Robinson ("Robinson") was scheduled to testify for Petitioner in the January 17, 1997 hearing. Petitioner intended Robinson to testify that he heard McCaster, Windom, and Brooks conspire against Petitioner while they were housed together in Mason. Robinson did not testify until May 13, 1997, where he stated that he never overheard any conspiracy against Petitioner. In addition, Robinson testified that, on January 17, 1997, while he, Petitioner, and Brooks were all housed in the same holding room, Petitioner passed Robinson a legal pad with Petitioner's questions and the desired answers. The court entered a pad into evidence, alleged by Petitioner to be the pad he passed Robinson. (Exhibit 4). On the pad were questions, but neither answers, erasures, nor deletions. Robinson asserted that it was not the same pad Petitioner passed him in January 1997.

## II. Legal Standard

### A. New Trial

A prosecutor's use of known perjury constitutes a "corruption of the truth-seeking function of the trial process,"and may entitle a defendant to a new trial. *See United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). Federal Rule of Criminal Procedure 33 permits a district court to grant a defendant a new trial when "the interests of justice so require." The decision to grant a new trial rests squarely within the discretion of the trial judge. *United States v. Barlow,* 693 F.2d 954, 966 (6th Cir.1982) (citations omitted).

---

5. The record does not set forth the contents of the interview between Borgers and McCaster.

The Sixth Circuit has employed two dissimilar standards when deciding motions for a new trial based on newly-discovered evidence of perjury. According to cases subscribing to the Seventh Circuit's "Larrison Rule,"a defendant must establish that (1) the testimony given by a material witness is false; (2) without the false testimony the jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it because it did not know of its falsity until after the trial. *Gordon v. United States,* 178 F.2d 896, 900 (6th Cir.1949) (citing *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928)); *see also United States v. Bouquett,* No. 87–3423, 1988 WL 5105 at *2 (6th Cir. Jan.28, 1988) (unpublished table disposition). Alternately, under a standard borrowed from the Fifth Circuit, the defendant must show (1) that the statements were false; (2) that the statements were material; and (3) that the prosecution knew the statements were false. *United States v. Pierce,* 62 F.3d 818, 834 (6th Cir.1995); *United States v. Farley,* 2 F.3d 645, 655 (6th Cir.1993); *United States v. O'Dell,* 805 F.2d 637, 640 (6th Cir.1986). Under the Fifth Circuit's standard, a statement is material if it is "a highly significant factor reasonably likely to have affected the judgment of the jury." *United States v. Mack,* 695 F.2d 820, 822–23 (5th Cir.1983). Despite continuing to apply the Larrison Rule in table dispositions, *see United States v. Zack,* No. 93–1045, 1993 WL 206474 at *1 (6th Cir. June 14, 1993) (unpublished table disposition), the Sixth Circuit has indicated, through its more recent opinions in *Pierce* and *Farley,* that the Fifth Circuit standard's is more appropriate. Therefore, in the instant case, the Court will apply Fifth Circuit's standard.

Deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. *United States v. Campbell,* 977 F.2d 854, 860 (4th Cir.1992). The Court may evaluate the weight of the evidence and the credibility of witnesses. *United States v. Louise Bentz,* No. 99–3286, 2000 WL 1648126 at *5 (6th Cir. Oct.27, 2000) (unpublished table disposition); *United States v. Kellington,* 217 F.3d 1084, 1095 (9th Cir.2000); *Campbell,* 977 F.2d at 860. Nevertheless, the defendant bears the burden of proving the need for a new trial, and motions for a new trial should be granted sparingly and with caution. *United States v. Turner,* 995 F.2d 1357, 1364 (6th Cir.1993); *United States v. Seago,* 930 F.2d 482, 488 (6th Cir.1991); *United States v. Garner,* 529 F.2d 962, 969 (6th Cir.1976).

## B. Due Process and a Speedy New Trial

Although courts have found that the speedy trial guarantee of the Sixth Amendment applies to criminal appeals and other post-trial proceedings via the Fifth Amendment's Due Process Clause, *see United States v. Smith,* 94 F.3d 204, 206 (6th Cir.1996) (citations omitted), no court has yet explicitly recognized a due process right to a speedy new trial pursuant to Federal Rule of Criminal Procedure 33. The Sixth Circuit, however, found that constitutional due process guarantees attach to those proceedings that form an "integral" and "inextricable" part of the "overall adjudicative system." *Woodard v. Ohio Adult Parole Auth.,* 107 F.3d 1178, 1186 (6th Cir.1997), *rev'd on other grounds,* 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998). Deciding a motion for a new trial based on allegedly newly-discovered evidence of perjury is an integral part of the overall adjudicative system, and the Court holds that a defendant has a

constitutional right to a speedy adjudication of such a motion.

■ Because a motion for a new trial is a post-trial proceeding, the Court borrows the standard for evaluating delay in the appellate context as set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).[6] According to that standard, a court must balance four factors in determining whether an appeal delay is unconstitutional: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. *Smith*, 94 F.3d at 207 (citing *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192). When considering prejudice to the defendant, courts must examine the following three sub-factors: (1) preventing oppressive incarceration pending appeal, (2) minimizing anxiety and concern of those convicted awaiting the outcome of their appeals, and (3) limiting the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired. *Smith*, 94 F.3d at 207 (citing *Harris v. Champion*, 15 F.3d 1538, 1559 (10th Cir.1994)). Like an appeal, a motion for a new trial that is "inordinately delayed" becomes a "meaningless ritual." *See id.* at 207 (quoting *Harris v. Champion*, 15 F.3d 1538, 1558 (10th Cir.1994)).

## III. Discussion

### A. New Trial

Petitioner alleges that the government, through the actions of Borgers and Brooks knowingly, intentionally, and willfully induced McCaster to testify falsely against Petitioner during Petitioner's December 1994 trial. Petitioner contends that, while

incarcerated together at Mason, Brooks persuaded McCaster to testify against Petitioner. Brooks then allegedly coached McCaster, so that McCaster could provide false, but convincing testimony against Petitioner. According to Brooks,

I make Mr. McCaster to understand that if he can tell Mr. Borgers the things that I am going to explain to him the right way that Mr. Borgers like to hear, Mr. Borgers use him to testify against Mr. Chauncy Gray and he could get help, and from there I started tutoring Mr. Shelly McCaster of all the things that could help him to work with Mr. Richard Borgers and enable to help hisself [sic] which also I would get credit for because Mr. Richard Borgers make me to understand that that is very good what I am doing with this person, while Mr. Borgers was able to conduct that type of business with Shelly McCaster in having him working for the government, too.

(Tr. April 17, 1997 at 26–27.) Petitioner argues that even if the government did not know McCaster's testimony was false, the government should have known that the testimony was false.

■ Applying the first prong of the three-pronged test, the Court finds that Petitioner has not carried his burden of proving that McCaster testified falsely at Petitioner's December 1994 trial. Although courts have not set forth an explicit standard, the Court concludes that a defendant must meet a fairly high standard of proof when establishing that a witness committed perjury. The Seventh Circuit held that new evidence, which did not *inevitably lead* to the conclusion that the gov-

---

**6.** The Court recognizes that a new trial is not identical to an appeal. A new trial can require the testimony of witnesses, the admission of evidence, and the creation of a record; whereas an appeal simply calls for the review of a complete and previously-compiled record. Nevertheless, because a new trial and an appeal are both post-trial proceedings, the Court finds the appellate standard to be the most appropriate.

ernment's witness committed perjury, could not support a motion for a new trial. *See United States v. Johnson*, 142 F.2d 588, 592 (7th Cir.1944) *cited in United States v. Johnson*, 327 U.S. 106, 109, 66 S.Ct. 464, 465, 90 L.Ed. 562 (1946). Similarly, in *United States v. Sasso*, 59 F.3d 341 (2d Cir.1995), the Second Circuit held that a motion for a new trial must be *sufficiently factually supported. Sasso*, 59 F.3d at 350. In addition, *Larrison* demands that the court be "reasonably well satisfied" that the witness committed perjury. *See United States v. Bouquett*, No. 87–3423, 1988 WL 5105 at *2 (6th Cir. Jan.28, 1988) (citing *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928)). "Inevitably leads to," "sufficiently factually supported," and "reasonably well satisfied," indicate a high standard of proof.

In the instant case, Petitioner has not satisfied this high standard while trying to prove that McCaster's testimony was false. Despite Petitioner's allegations of perjury, McCaster maintained that he testified truthfully in December 1994. Rather than "sufficiently factually supporting" his allegations, Petitioner simply forwards his own testimony and the testimony of an incredible witness (Brooks) in an attempt to convince the Court that McCaster committed perjury. Petitioner fails to proffer any recantations, tangible proof, or credible testimony to contradict McCaster. Left to make credibility assessments, the Court finds Brooks and Gray less credible than McCaster. Although both McCaster and Brooks are convicted felons, Brooks notably testified that he would lie against someone when he was upset, (Tr. April 17, 1997 at 64), and it was demonstrated that Brooks was upset at the government for not giving him credit for McCaster's testimony and commencing deportation proceedings. (Tr. May 12, 1997 at 142).

Setting forth three instances of alleged false testimony from McCaster during the new trial hearings, Petitioner would have the Court believe that McCaster is not a credible witness. (Petitioner's July 16, 1997 Reply at 2). Nevertheless, in each instance, the Court cannot determine whether the statement was false. In the light of Borgers's testimony that Borgers interviewed McCaster in Mason, McCaster maintained that he never discussed his prospective testimony with Borgers (Tr. Oct. 31, 1996 at 9). Although, one could assume that the interview concerned McCaster's prospective testimony, the record contains no details of this interview except Brooks's statement that McCaster told Borgers "everything that he knew about [Petitioner]." (Tr. April 17, 1997 at 35). Arguing that McCaster first learned through Brooks that Petitioner was facing charges, Petitioner challenges McCaster's statement that he first learned of such charges through Officer William Gates. (Tr. Oct. 31, 1996 at 20). Nevertheless, Borgers did not testify that McCaster first learned of the charges through Brooks, but simply that Borgers first learned of McCaster's willingness to testify through Brooks. Finally, Petitioner asserts that McCaster testified untruthfully that he never met with Brooks concerning Petitioner's case. Although Robinson testified that McCaster and Brooks met together frequently, there is no evidence outside of Brooks's testimony that they spoke about Petitioner's case.

Conversely, Brooks's testimony during the new trial hearings is more suspect than McCaster's. First, Brooks testified that Borgers called him at Mason, whereas Borgers testified that this statement was false. Brooks also testified that he called Borgers later than midnight on numerous occasions, which Borgers denied. While working with the Task Force,

Brooks told Borgers that he possessed information concerning where Petitioner stored his drugs and with whom he dealt, (Tr. May 12, 1997 at 134–35), yet Brooks testified at the hearing that Petitioner was not a dealer.[7] Combining the aforementioned inconsistencies with Brooks's statement that he would lie when he was upset with someone, leads the Court to find Brooks less credible than McCaster. As a result, the Court determines that Petitioner did not bear his initial burden of proving that McCaster's testimony was false. If a defendant cannot prove that false testimony was given at the former trial, the court need proceed no farther in its analysis and can deny the motion for a new trial outright. *United States v. Chambers,* 944 F.2d 1253, 1264 (6th Cir.1991); *United States v. Strauss,* 443 F.2d 986, 990 (1st Cir.1971); Charles Alan Wright, *Federal Practice and Procedure* § 557.1 at 344 (1982).

■ Although not required to perform any further analysis, the Court addresses some of the issues raised by Petitioner. Petitioner claims that Borgers knew, or should have known, that McCaster gave allegedly false and coached testimony. When Petitioner asked Brooks whether Borgers was aware that McCaster's testimony would be allegedly false, Brooks stated, "He [Borgers] heard what I told him that I'm going to get someone that can do the job, that I was going to prepare Mr. McCaster, he know it. He ain't no fool, he been in the street working." (Tr. April 17, 1997 at 29.) Although telling an officer that "I'm going to get someone that can do the job" amidst allegations of coached testimony would typically alert the Court to possible wrongdoing, the Court is reluctant

to grant a new trial when the witness is of such questionable credibility. Borgers testified that he neither told Brooks or McCaster to concoct false testimony nor was he aware that they were allegedly doing so. (Tr. May 12, 1997 at 140). Borgers testified that members of the Task Force informed him that McCaster was a suspected drug dealer who had been seen around California Cars. (Tr. May 12, 1997 at 139–40). Therefore, Borgers had reason to believe that McCaster possessed first-hand information regarding Petitioner.

■ Further, the defendant must establish that the material, asserted to be newly discovered, could not have been discovered with due diligence before or during the trial. *See United States v. Robinson,* 585 F.2d 274, 278 (7th Cir.1978). In the instant case, Petitioner would be well aware of McCaster's alleged perjury concerning his personal dealings with Petitioner. *See United States v. Bouquett,* No. 87–3423, 1988 WL 5105 (6th Cir. Jan.28, 1988) (unpublished table disposition)(citing *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928)) (emphasis added). If it were true that Petitioner had seen McCaster only "once or twice" before McCaster testified against him at trial, and that Petitioner never engaged in any illegal conduct with McCaster, (Tr. April 17, 1997 at 95), Petitioner could have more doggedly cross examined McCaster during his December 1994 trial to expose any falsity, coaching, or inappropriate communication between McCaster and a third party. Though Petitioner may have been unaware of who coached McCaster, Petitioner could not have doubted that he was coached by someone. Nevertheless, during his 1994

---

7. Furthermore, to explain Petitioner's questionable drug-related activities, Petitioner and Brooks both testified that Petitioner liked to "play" with the government, to let the government think they could catch him in the act. (Tr. April 17, 1997 at 21.) The Court finds this highly unbelievable.

trial, Petitioner did not once question McCaster about any supposed coaching.

Were the Court to decide Petitioner's motion for a new trial based solely upon the hearings, the Court would deny the motion, because Petitioner has not carried his burden of proof. Nevertheless, the Court is also required to address Petitioner's Fifth Amendment due process claims and order an appropriate remedy.

## B. Due Process and a Speedy New Trial

Petitioner filed a motion for a new trial on April 8, 1996. Judge McCalla conducted hearings on the motion from October 1996 through May 1997. The government submitted its post-hearing response on May 28, 1997, and Petitioner submitted his summation on June 5, 1997. Petitioner also filed a reply to the government's post hearing response on July 16, 1997. Before ruling on the motion, Judge McCalla recused himself from the case on August 31, 2000, and the case was reassigned to this Court. The Petitioner contends that Judge McCalla's "inordinate delay" in the issuance of a ruling on the motion for a new trial violates Petitioner's Fifth Amendment right to the due process of law. (Petitioner's March 30, 2001 Supplemental Memo. at 2). Applying the standard used to adjudicate claims for a speedy criminal appeal, Petitioner argues that the Court should set aside his conviction.

■ To decide allegations that a defendant was denied due process because he was not afforded a speedy new trial, the Court adopts the Sixth Circuit's four-factor standard employed in speedy criminal appeal cases. The four factors that the Court must balance when determining whether an appeal delay is unconstitutional are (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defendant. *United States v. Smith,* 94 F.3d 204, 207 (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972)).

■ For a constitutional inquiry to be triggered, the Court must find the length of delay to be unreasonable on its face in the light of the particular circumstances. *Smith,* 94 F.3d at 209 (quoting *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192). Courts evaluate appellate delays on a case-by-case basis, but the Sixth Circuit has found that a three-year delay in granting an appeal triggers a constitutional inquiry. *Id.* at 209. In the instant case, nearly four years have passed since Judge McCalla concluded the hearings on Petitioner's motion for a new trial. Therefore, the Court finds that the length-of-delay factor weighs in favor of Petitioner.

■ Because the government offered no reason for the delay,[8] the second factor weighs in Petitioner's favor. Similarly, the third factor weighs in Petitioner's favor. Despite Petitioner's failure to assert his right to have his motion heard at any point between July 16, 1997[9] and March 20, 2001,[10] the Court rejects any notion that a Petitioner who fails expressly to demand a speedy new trial forever

---

**8.** Judge McCalla recused himself on August 31, 2000 without providing a reason for the recusal or a reason for not deciding Petitioner's motion for a new trial by that date.

**9.** Petitioner filed a reply to the government's post hearing response to Petitioner's motion for a new trial.

**10.** Petitioner submitted a supplemental memorandum of law forwarding due process claims.

waives his right. *See id.* at 210 (citing *Barker*, 407 U.S. at 528, 531–32, 92 S.Ct. at 2191, 2192–93). It is plausible to presume that an incarcerated Petitioner desires a timely appeal, without requiring him to petition the Court to prove that desire. *Id.* at 210. Requiring a defendant to assert his right to have his motion heard is a remnant of the four-part *Barker* standard when it was originally applied to motions for a speedy trial. *See* Marc M. Arkin, *Speedy Criminal Appeal: A Right Without a Remedy*, 74 Minn. L.Rev. 437, 473–74 (1990). In a pre-trial situation where both the government and the defendant could benefit from a delay, it was often incongruous for the defendant to benefit from a delay and then assert that such a delay was a violation of due process. In post-trial proceedings, especially after incarceration, the Court will presume that "appellate delay is always harmful to the defendant," *id.* at 474, and that the defendant wishes to assert his right to a new trial.

▮ Finally, the fourth element requires Petitioner to demonstrate prejudice. When considering prejudice to the defendant, courts must examine the following three sub-factors: (1) preventing oppressive incarceration pending appeal, (2) minimizing anxiety and concern of those convicted awaiting the outcome of their appeals, and (3) limiting the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired. *Smith*, 94 F.3d at 207 (citing *Harris v. Champion*, 15 F.3d 1538, 1559 (10th Cir. 1994)). The Petitioner satisfies the first two sub-factors because he has been incarcerated for nearly four years and has received no notice from the Court regarding his outstanding motion. Petitioner has also demonstrated prejudice, because following the hearings in 1996 and 1997, the government deported Brooks, Petitioner's main witness to test McCaster's credibility.[11] As a result of Brooks's deportation, Petitioner's ability to assert defenses in a new trial was impaired. Therefore, Petitioner has demonstrated that he was prejudice by the inordinate delay.

▮ A variety of remedies are available when a substantial delay in the processing of an appeal results in a due process violation. *See Doescher v. Estelle*, 477 F.Supp. 932, 934 n. 2 (N.D.Tex.1979). The Court may order a new appeal, *see Cody v. Henderson*, 936 F.2d 715, 722 (2d Cir.1991), reconsider bail, *see Morales Roque v. People of Puerto Rico*, 558 F.2d 606, 606 (1st Cir.1976), entertain actions for damages under the civil rights statutes, *see Rheuark v. Shaw*, 547 F.2d 1257 (5th Cir. 1977), grant a conditional appeal, *Coe v. Thurman*, 922 F.2d 528, 532–33 (9th Cir. 1990), or release the Petitioner from prison. *See Simmons v. Reynolds*, 898 F.2d 865, 869 (2d Cir.1990); *Burkett v. Cunningham*, 826 F.2d 1208, 1220 (3d Cir. 1987). Dismissal of an indictment is a remedy in the most egregious instances when a defendant is denied a speedy trial. *See Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973). Unlike the instant case, when a defendant is denied a speedy trial he is denied his day in court. Releasing Petitioner from prison is an extreme remedy, especially in the light of his jury trial and subsequent guilty verdict. *See Simmons*, 898 F.2d at 869. Therefore, the Court finds the most appropriate remedy is to grant Petitioner's motion for a new trial.[12]

---

**11.** In addition, Alvin Gray, a pro-government witness, died.

**12.** In the light of Alvin Gray's death and Brooks's deportation, Petitioner's new trial may well involve submitting testimony from

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Petitioner's motion for a new trial.

the 1996 and 1997 hearings into evidence. Although the Court reviewed the transcripts and reached the conclusion that Brooks was not a credible witness, Petitioner has the right to have a jury evaluate the same testimony to reach its own conclusion regarding Brooks's credibility. Finally, the Court acknowledges that the inordinate delay results in prejudice both to Petitioner and the United States.