**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kent August MOECKLY, Joseph Diego Ramirez, and William J. Coulombe, Defendants-Appellants.**

**Nos. 84–5223 to 84–5225.**

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1985.

Decided July 15, 1985.

Rehearings and Rehearing En Banc Denied Oct. 17, 1985.[*]

---

[*] Judges Heaney, McMillian, Arnold and Fagg would grant the petitions for rehearing en banc limited to the venue issue.

454

See also, 8 Cir., 761 F.2d 1227.

Phillip S. Resnick and Ronald Mesbesher, Mark W. Peterson, Minneapolis, Minn., for defendants-appellants.

John M. Lee, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff-appellee.

Before ARNOLD, Circuit Judge, PHILLIPS,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

PHILLIPS, Senior Circuit Judge.

Defendants Kent Moeckly, Joseph "Casey" Ramirez, and William Coulombe appeal separately their convictions for conspiracy to import cocaine, 21 U.S.C. § 963, and conspiracy to possess cocaine with intent to distribute it, 21 U.S.C. § 846. The indictment charged these conspiracies were in existence from early 1981 through April of 1983 and were carried out in Minnesota, Florida, and elsewhere. Appellant Moeckly also was convicted of two counts of perjury before a grand jury investigating defendants' smuggling activities, 18 U.S.C. § 1623. Following their convictions upon jury verdicts, they received the following penalties: Moeckly was sentenced to serve seven years of imprisonment and received a $10,000 fine. Coulombe received a total penalty of ten years of confinement and a $10,000 fine. Ramirez received a total sentence of twenty years of confinement and a $50,000 fine. Defendants filed timely appeals to this court. We affirm the convictions.

I

This prosecution arose when a small airplane belonging to defendant Ramirez was abandoned in the Bahamas with twelve duffel bags of cocaine after being pursued by United States customs planes. Ramirez operated a fixed-base operation at the Princeton, Minnesota airport, a business

---

* The HONORABLE HARRY PHILLIPS, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

providing storage and maintenance services for private airplanes, as well as flight lessons.

On April 20, 1983 Ramirez placed a telephone call from Florida to Gregory Schmidt in Minnesota, requesting him to fly one of Ramirez' planes, a Cessna 210, No. 6544 Yankee, from Princeton to Florida. Schmidt was the prosecution's chief witness; he testified under a promise of immunity from prosecution for smuggling charges. The next day, Schmidt flew the plane to Fort Lauderdale and was met at the airport by Ramirez and Moeckly. The three went to a townhouse owned by Ramirez and later returned to the airport. They installed four or five extra fifteen gallon fuel tanks into another of Ramirez' planes, a Cessna 210, No. 6608 Charlie, and had it fueled. Ramirez gave a $100.00 tip to the person who fueled the plane. The three then returned to Ramirez' townhouse.

Schmidt testified that Coulombe came by the townhouse sometime that evening. Ramirez decided that it would be Coulombe, and not Schmidt, who would fly 6608 Charlie on a smuggling mission from South America and be paid $50,000. Later that night, Schmidt and Moeckly prepared a large lunch for Coulombe's flight. The following morning, Friday, April 22, 1983, Ramirez, Schmidt, and Moeckly loaded the lunch, a life raft, and other gear onto 6608 Charlie, and connected auxiliary fuel pumps. The co-pilot's seat had been taken out of the plane. Coulombe checked out of his hotel at 6:20 a.m., met the others at the airport, and took off with a single male passenger. That afternoon, Ramirez' girlfriend, Pamela Jackson, arrived to vacation with him.

On Saturday afternoon, Ramirez asked Schmidt and Moeckly to fly his planes in a "cover" operation to determine whether Coulombe was being pursued by customs aircraft upon his return. Ramirez was to fly another of his planes. They operated on a particular radio frequency and were to use prearranged codes. Moeckly was to fly "touch and goes" at the Opa Locka West airport, a remote and unoccupied airport where, according to Schmidt, Ramirez and Moeckly had landed on a previous occasion, and Moeckly had criticized Ramirez for using his name on the radio frequency.

Schmidt heard Ramirez and Coulombe converse and Ramirez gave a signal to indicate trouble. Ramirez gave instructions to evade two customs planes that were in pursuit. Schmidt and Moeckly landed their planes at Boca Raton airport after Ramirez and Coulombe had decided to abandon Florida airspace. Moeckly told Schmidt that Coulombe and Ramirez probably flew to the Bahamas and that they should stay away from Ramirez' townhouse. Pamela Jackson later relayed a message to Schmidt to fly to the Bahamas.

A customs pilot testified he observed evasive maneuvers by 6608 Charlie and that it finally headed toward the Grand Bahamas while continuing its evasive maneuvers. It made two approaches to a field, passed over Freeport airport, and landed on a dirt road between 5:00 and 5:15 p.m. The pilot observed green duffel bags in the plane. Ramirez landed at the Freeport airport at 5:20 p.m. in 5296 Yankee according to customs documents. At 7:00 p.m., Bahamian police located 6608 Charlie and removed five blue plastic gas cans and twelve duffle bags of cocaine. Schmidt landed at Freeport airport around 10:30 p.m. and was met by Ramirez who informed him that Coulombe had landed on the island. After a search, they found Coulombe and brought him to a hotel. Ramirez criticized Coulombe for not burning the plane. Coulombe was angry over the loss of the 400 pound cargo of cocaine.

In a secondary search of 6608 Charlie, sixteen international aeronautical maps were recovered. Eight of these bore 44 fingerprint impressions and seven palmprint impressions of Coulombe concentrated along the path to South America. One had multiplication figures apparently reflecting the pounds of cocaine loaded on the plane. Four of Ramirez' fingerprint impressions were identified on one of the maps. The canvas bags were found to

have 181 fiberglass-encased packages each containing a kilogram of cocaine, a total of 398 pounds.

On Sunday, April 24, 1983, Ramirez instructed Schmidt and Coulombe to ditch a seat from 6608 Charlie in the ocean. Upon their return that day to the United States in 5296 Yankee, Schmidt filed a customs report listing himself as pilot and Coulombe as a passenger. They returned to Ramirez' townhouse where Moeckly and Jackson were waiting. Ramirez flew back separately and went to the townhouse where he argued with Coulombe about his refusal to pay Coulombe for the mission. Schmidt and Moeckly then flew to Minnesota in 6544 Yankee.

Schmidt had flown from Minnesota to Florida to assist Ramirez in preparing 6608 Charlie for similar flights and had flown cover on other occasions in 1982. Schmidt had been acquitted of perjury in a trial in May 1984. He offered to testify in return for immunity from smuggling charges. The district court held a hearing to evaluate inconsistencies between statements he made and previous testimony he had given and to determine whether he had received immunity from perjury charges for his trial testimony. Schmidt previously had denied knowing how Coulombe got to the Bahamas and denied having searched for him with Ramirez. Schmidt admitted being threatened with prosecution if he refused to testify against Ramirez. He admitted to smuggling activity and cover operations that he had denied previously. At trial, Schmidt described previous operations with Ramirez that used common plans or schemes, including cover flights, use of radio frequencies and codes, use of auxiliary fuel containers, use of the same plane, 6608 Charlie, and operations smuggling guns or drugs from South America. He testified that Moeckly also had flown cover for Ramirez on another occasion.

Apart from Schmidt's testimony, the Government introduced other evidence of Ramirez' past activity. Stephen Lett testified, over objection by Coulombe's counsel, that Ramirez made four trips to the Bahamas with him, two of which involved attempts to purchase marijuana. Jack Devoe testified under a plea agreement conditioning the Government's sentencing recommendation on the quality and quantity of his trial testimony. He had pleaded guilty to federal smuggling charges and faced between thirty and ninety years of imprisonment. The sentencing recommendation would affect this sentence as well as parole eligibility and further immunity. Devoe testified he was aware that how he testified would affect his sentence. His testimony was allowed by the court despite objections that he had an incentive to perjure himself. Devoe testified that he had made several smuggling trips with Ramirez between 1980 and 1981, and helped Ramirez set up his own operation. He testified Ramirez admitted smuggling cocaine in Cessna 210 airplanes such as 6608 Charlie. Devoe had given testimony previously in other trials. The district court ordered the Government to supply this prior testimony to the defense, and it supplied Devoe's testimony from a federal trial in West Palm Beach and before a grand jury in Minneapolis. The Government was not able to supply his testimony before a Bahamian commission, testimony before a state grand jury in Miami, or testimony in a federal trial in Miami.

Marvin Osheroff, a Hialeah dry cleaner, testified over objection that Ramirez brought a green duffel bag to his establishment early in 1981. He stated that the bag was full of over $1 million in cash that Ramirez transferred to some suitcases. Osheroff produced the bag and it was found to contain traces of cocaine. The bag was similar to those used to transport cocaine.

Over objection, Donald Perbix testified to large cash deposits Ramirez made at the Community State Bank of Princeton. Again over objection, Joyce Edmonds from the Princeton Credit Union testified to large cash transactions by Ramirez. Ramirez brought more than $850,000.00 in cash to the credit union over the years. The credit union would use the cash for

daily operations and negotiation of checks, which it would deposit to Ramirez' account. On occasion, Moeckly accompanied Ramirez when he brought in cash and would bring in cash himself for deposit to Ramirez' account. Coulombe also accompanied Ramirez to the credit union on one occasion. Neither the bank nor the credit union filed cash transaction reports. Ramirez once deposited $100,000.00 in cash to the credit union for Devoe in the early 1980s. Moeckly delivered about $20,000.00 to Devoe in Florida. The remainder was paid in the form of three airplanes, one of which was delivered by Coulombe.

William Morris testified, over objection, that he discussed smuggling operations with Ramirez in the fall of 1981. Ramirez told him Moeckly was his co-pilot on some of the trips he had made and "that it was okay for [him] to speak freely about anything in front of him." Moeckly was not present at a later conversation between Ramirez and Morris in February of 1982 when Ramirez proposed that Morris fly decoy or cover operations for him. Morris also testified that he delivered auxiliary fuel containers to Ramirez and Moeckly for a mission Ramirez eventually called off.

Witness Gail Vail testified she ferried Ramirez' planes from Princeton to Florida on several occasions between November 1981 and January 1982. The planes included 6608 Charlie. On one occasion, she was met by Ramirez and Moeckly. Dennis Wolak testified that he ferried planes for Ramirez, including Cessna 210s, between Princeton and Florida in 1982.

During the grand jury investigation of Ramirez' activities, beginning in April 1982 Moeckly, an attorney, asserted his fifth amendment right against self incrimination in response to questions about Ramirez or ownership of aircraft. The assistant United States attorney asked Moeckly whether he had contacted particular attorneys, who were well known criminal defense lawyers, in connection with the investigation. Moeckly denied that he had kept a pilot log after 1978 and claimed he did not recall being in Florida during 1983. There was other grand jury testimony, however, that Moeckly had been in Florida, and had stayed with Ramirez and studied Spanish there. There was also testimony by his flight instructor, Gail Vail, that she recorded a flight instruction in Moeckly's log book and that he kept his records in pencil. Moeckly was convicted for perjury based on his denial of being in Florida or maintaining a log book. He was acquitted of perjury for his statement that he had never owned an aircraft. The district court denied defendants' motion to sever Moeckly's perjury charges from other charges.

Ramirez moved to dismiss the indictment prior to trial, asserting improper venue in Minnesota. Coulombe joined in this motion and another at the close of the evidence. The Government opposed the motion, contending that it would establish venue during trial. Immediately prior to closing arguments, Ramirez requested a venue instruction and submitted a proposed instruction. Although not in the record, Ramirez' counsel states he handed the court a note requesting a ruling on the venue instruction and the court sent a note indicating it was not going to instruct on this issue. The court denied a new trial after the jury rendered its verdict. The court held that applicable cases did not require a venue instruction because venue was not "in issue."

## II

■ Ramirez argues that the district court erred by refusing to instruct the jury that venue must be proved in the district of Minnesota. The Government argues that defendants' failure to object to the jury instructions before the jury retired as required by Fed.R.Crim.P. Rule 30 operates as a waiver of objections. When a claim of error is not preserved, it may be reviewed only for plain error. *See United States v. Bear Ribs*, 722 F.2d 420, 424 (8th Cir.1983); *United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir.1980); *United States v. White*, 611 F.2d 531, 536 (5th Cir.), *cert. denied*, 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 847 (1980); *United States v. Hon-*

*neus,* 508 F.2d 566, 571 (1st Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975).

■ Here Ramirez and Coulombe moved to dismiss for lack of venue prior to trial and again brought the matter to the court's attention at the close of the proof. Ramirez tendered a proposed instruction on venue and formally requested the instruction. He again raised the matter in a motion for a new trial. Ramirez and Coulombe have not waived their objections; the trial court clearly had an opportunity to correct any errors it may have made. *See United States v. Netz,* 758 F.2d 1308, 1311–12 (8th Cir.1985) (per curiam) (venue issue preserved when raised prior to trial and in motion for dismissal at close of case).

■ Proper venue is required by Article III, § 2 of the United States Constitution and by the sixth amendment, as well as Rule 18 of the Federal Rules of Criminal Procedure. Venue questions in criminal cases "raise deep issues of public policy" and "are not merely matters of formal legal procedure." *United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944). In *United States v. Jackalow,* 66 U.S. (1 Black) 484, 17 L.Ed. 225 (1862), the Supreme Court reversed a piracy conviction on venue grounds. Although the jury found the offense was committed at a particular location, it was not instructed to find whether the location of the offense was within the jurisdiction of the district of New Jersey where the case was tried. The Court noted that the location of the offense was subject to a border dispute. It held that:

> the boundary of a State, when a material fact in the determination of the extent of the jurisdiction of a court, is not a simple question of law. The description of a boundary may be a matter of construction, which belongs to the court; but the application of the evidence in the ascertainment of it as thus described and interpreted, with a view to its location and settlement, belongs to the jury. All the testimony bearing upon this question, whether of maps, surveys, practical location, and the like, should be submitted to them under proper instructions to find the fact.

*Id.* at 487–88. The Court remanded for a new trial because the verdict did not furnish a basis for the Court to determine whether the offense occurred within the state.

In *United States v. Black Cloud,* 590 F.2d 270 (8th Cir.1979), it was also unresolved whether the offense (receipt of a firearm by a convicted felon) took place in one State or another. There was conflicting evidence whether the defendant received the gun in North Dakota, where he was tried, or in South Dakota, which also was covered by the Standing Rock Reservation where he was arrested. The jury inquired during deliberations whether all cases in the reservation fell within the district. The court instructed, over objection, that its authority to hear the case was not dependent on where in the reservation the offense occurred. This court stressed that whether receipt of the firearm occurred in North Dakota where venue was proper is a question of fact for the jury. *Id.* at 272 (citing, *e.g., Dean v. United States,* 246 F.2d 335 (8th Cir.1957)). The court stressed that venue was a subject of "vigorous dispute" and remanded for a new trial because there was no finding of proper venue.

■ In the present case, the indictment charged six of twenty overt acts that concerned or occurred in Minnesota, including storage of the smuggling and "cover" planes, shuttling of the planes between Florida and Minnesota, contact between parties in those two states, and other preparations. The Government bears the burden to prove venue by a preponderance of the evidence. *United States v. Netz,* 758 F.2d 1308, 1312 (8th Cir.1985) (per curiam) (citations omitted). Proof of any of these overt acts makes venue in Minnesota proper. In *United States v. Overshon,* 494 F.2d 894 (8th Cir.), *cert. denied,* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974), the court noted that "venue as to prosecution of all members of a conspiracy lies either in

the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." *Id.* at 900 (citations omitted). Additionally, 18 U.S.C. § 3237(a) provides that an offense covering more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued or completed."

This case, unlike *Jackalow* and *Black Cloud,* does not involve an unresolved question of where the offenses occurred. The issue here is whether venue was proven where there was no finding by the jury that at least one overt act or the conspiratorial agreement occurred in Minnesota. The trial court held that an instruction on venue was not required because proof of the Minnesota acts was "overwhelming and uncontroverted" and venue therefore was not "in issue." Some finding by the jury on this issue should have been required. Venue is not "in issue" only when there is a question where a criminal act occurred, but also in cases such as this when defendants can be convicted of the offenses charged without an implicit finding that the acts used to establish venue have been proven.

Nevertheless, courts have recognized that proof of venue may be so clear in some cases that the failure to instruct on the issue is not reversible error. In *United States v. Netz,* 758 F.2d 1308 (8th Cir.1985) (per curiam), the defendant was convicted of importation and possession with intent to distribute cocaine that was secreted in furniture shipped from South America to his home in the Western District of Missouri. He argued the court should have instructed on venue because the furniture had arrived in Florida en route to his home. This court, noting that venue for importation offenses is proper in any city along the route to the destination, upheld the district court's conclusion as a matter of law that there was no factual dispute concerning proper venue. *Id.* at 1312. It stressed, however, that the better practice is to submit the issue for jury consideration. *Id.*

Similarly, in *United States v. Overshon,* 494 F.2d 894 (8th Cir.), *cert. denied,* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974), the court upheld convictions for conspiracy to deal in firearms without a license when there was uncontroverted proof of several overt acts, including sales of firearms, within the district where trial was held.

In *United States v. Massa,* 686 F.2d 526 (7th Cir.1982), the defendant was charged with several counts of filing fraudulent tax returns. The defendant testified he prepared tax returns for all his clients in his office in Lake County, Indiana, for which venue was proper. The fraudulent returns all were typed on the typewriter the defendant kept in his office. The court held venue was not in issue because there was no evidence the returns were prepared elsewhere. In such circumstances, the court held, the venue determination is for the court to make as a matter of law. *Id.* at 531. Similarly, in *United States v. Winship,* 724 F.2d 1116 (5th Cir.1984), the court also found venue was not in issue. There the defendants, residents of Oklahoma, were convicted of drug distribution conspiracies in the Western District of Louisiana. Five of six coconspirators testified to distributing marijuana and methamphetamine in Alexandria, the place of venue. The defendants were identified as the source of both, and testimony showed they were aware of the coconspirators' distribution activities in Louisiana. The court noted that venue is proven only by a preponderance of the evidence and may be waived more easily than other constitutional rights. *Id.* at 1124. The court stressed that all counts designated the Western District of Louisiana as the situs of the offenses and that there was overwhelming, uncontradicted evidence of possession and distribution there. *Id.* at 1125. The court therefore concluded that trial testimony did not place venue in issue, *id.* at 1125–26, and also noted that any error from denial of the venue instruction was harmless, *id.* at 1126 n. 13.

Although these cases are helpful to our analysis, they do not apply directly to this

case. Venue was in issue in the district court. Defendants could have been convicted without the jury having concluded that they committed any overt acts in Minnesota. In *Green v. United States*, 309 F.2d 852 (5th Cir.1962), the defendants were charged with a moonshining conspiracy in the Northern District of Florida. Twenty-Two of the overt acts charged occurred in the Southern District, where the case was transferred. The district court refused to instruct the jury that it was required to find participation in the overt act in the Northern District, and the Fifth Circuit reversed. The court stressed that venue had to be proven in the Northern District by proof of one overt act in that district. The court held: "The dangers of abuse are manifold if the Government can obtain an indictment for conspiracy in a district other than the district where the offense was actually committed merely by alleging that one act, *which need never be proved*, was committed in that district." *Id.* at 856 (emphasis in original). Similarly, in the present case, the jury should have been afforded the opportunity to make a finding of proper venue. This is not a case where proof of the charges necessarily resulted in a finding of proper venue.

It is clear, however, that evidence of the acts committed in Minnesota, including storage and shuttling of planes, was uncontroverted and substantial. The planes that flew the cover operations and the smuggling mission proven to the jury were stored and shuttled from Princeton to Florida. Where evidence is this clear on the issue of proper venue, any error from denial of jury instructions on the issue is harmless. In *United States v. Jenkins*, 510 F.2d 495 (2d Cir.1975), the defendant was charged with possession of welfare checks stolen from the mail. There was much evidence that the defendant owned a store in New York City where venue was proper, that he cashed the checks at a market there and would have the money within two hours, and that all the payees resided there. The court concluded that "the overwhelming evidence presented at trial of the commission of the crime in the Southern

District would render harmless any error which may inhere in failing to submit the issue of venue to the jury." *Id.* at 498–99. Similarly, in *United States v. Gillette*, 189 F.2d 449 (2d Cir.), *cert. denied*, 342 U.S. 827, 72 S.Ct. 49, 96 L.Ed. 625 (1951), the court found that although it was error not to instruct that some act of aiding and abetting in Manhattan was required in order to convict the defendant of charges there, the error was "not so grave as to require reversal." *Id.* at 452. There was ample testimony in *Gillette* that the defendant attended a meeting with other defendants in New York City, and made calls from there to Chicago to further the plan to transport counterfeit checks there. The court stressed that the jury, by convicting the defendant, necessarily believed the witness who testified to activity in New York City. *Id.* at 452, 454.

Defendants have not contradicted the evidence of activities in Minnesota to further the smuggling conspiracy. All were residents of Minnesota. The profits from smuggling activity were deposited there. In view of the overwhelming evidence of the acts that took place there, denial of the venue instruction was not prejudicial error. Moreover, the Constitution assures proper venue to ensure against "the unfairness and hardship to which trial in an environment alien to the accused exposes him." *United States v. Johnson*, 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944). This problem was not presented here.

### III

▬ Appellants make numerous other assignments of error. Coulombe and Moeckly challenge the sufficiency of the evidence to support their conspiracy convictions. The facts as recited above provide sufficient evidence to uphold their convictions. They argue that Schmidt's testimony was unreliable because he testified pursuant to a plea bargain and feared prosecution. This was not a basis for excluding the testimony, but was a proper subject for impeachment on cross examination. *See United States v. Evans*, 697 F.2d 240, 245

(8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). Other evidence, including hotel and customs records, fingerprint evidence, witness identifications of the parties together, and items found on the plane, corroborate Schmidt's testimony as to Coulombe. Schmidt's testimony regarding Moeckly's participation in preparing for the smuggling expedition, including adding auxiliary fuel tanks, flying cover, and being aware that Coulombe and Ramirez flew to the Bahamas to avoid customs planes, is sufficient to sustain his conviction. His actions show he was aware of the "essential object" of the conspiracy. *See United States v. Lee*, 743 F.2d 1240, 1250 (8th Cir.1984). Accomplice testimony is sufficient to support a conviction when it is not incredible or insubstantial on its face. *United States v. Watson*, 677 F.2d 689, 691 (8th Cir.1982) (per curiam).

■ Defendants also argue they were denied due process because Jack Devoe testified against them pursuant to a plea bargain conditioning sentencing recommendations on the quality and quantity of his testimony. They maintain the Government's discretion to make sentencing and parole eligibility decisions based on Devoe's testimony created a risk of perjury. Defendants rely on *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985), where a panel of this court reversed a conviction based on a witness' plea bargain and the full court affirmed the conviction by an equally divided court sitting en banc. *Waterman* is distinguishable because there the prosecution's favorable recommendations depended on whether the witness' testimony resulted in indictments. *Id.* at 1529. The court stressed that it was concerned with "the fairness of agreements to reward those who testify for the government *contingent upon* the content and results of their testimony." *Id.* at 1531 (emphasis in original). Here the district court held a hearing in which Devoe testified that the "quality" of his testimony referred to its truthfulness and had nothing to do with obtaining convictions. The district court properly concluded that the testimony was admissible because the plea agreement was not contingent upon success of the prosecution. The testimony of William Morris also was admissible despite the Government's recommendation of a lighter sentence to obtain it. *See United States v. Evans*, 697 F.2d 240, 245 (8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983).

■ Ramirez argues that Devoe's testimony should be stricken because the Government did not supply some of his previous testimony in compliance with the Jencks Act, 18 U.S.C. § 3500. This Act required the Government to turn over statements in its possession that relate to the subject matter of the witness' testimony at trial. 18 U.S.C. § 3500(a). The Act applies to written statements of the witness and contemporaneous recordings or transcripts, including stenographic notes of testimony or statements. The district court ordered the Government to supply all Jencks material but the Government did not produce Devoe's testimony before a Royal Bahamian Commission, testimony in a Florida state grand jury proceeding, or a federal trial in Miami. Ramirez argues that this material may have concerned Devoe's plea agreement and should have been produced. The district court reviewed affidavits by officials of the Drug Enforcement Administration swearing that they did not have and had not seen transcripts of Devoe's testimony before the Bahamian Commission or the Florida state grand jury. The Jencks act does not apply to statements made to state officials when there is no joint investigation or cooperation with federal authorities. *United States v. Silva*, 745 F.2d 840, 845 (4th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985); *United States v. Smith*, 433 F.2d 1266, 1269 (5th Cir.1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1206, 28 L.Ed.2d 328 (1971). The district judge found, based on sufficient evidence, that the Bahamian Commission and the Florida state grand jury testimony were not Jencks materials and were not in

the possession of federal authorities. In regard to the federal trial in Miami, the testimony had not been transcribed and therefore was not in possession of federal authorities. *United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). It should be noted that the Government did produce a transcript of Devoe's testimony in another federal trial in West Palm Beach, Florida. The Government also produced a transcript of his testimony before a grand jury in Massachusetts, which the district court found was not relevant to defendant's trial. The record reveals that the Government conducted an extensive search for Jencks material.

The efforts by the Government to produce the materials and the availability of other testimony by Devoe, who was not a major witness, support the conclusion that the admission of his testimony was not reversible error. Where there is no indication of bad faith on the part of the Government and no indication of prejudice to the defendant, courts have been reluctant to overturn convictions for noncompliance with the Jencks Act. *E.g., United States v. Izzi,* 613 F.2d 1205, 1213 (1st Cir.), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980); *United States v. Rippy,* 606 F.2d 1150, 1154 (D.C.Cir.1979) (per curiam); *United States v. Heath,* 580 F.2d 1011, 1019 (10th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979).

■ Coulombe argues it was error to allow evidence of past crimes committed by Ramirez. He maintains that evidence of Ramirez' deep involvement in smuggling made it appear that those who worked closely with him also were involved. Coulombe objected that evidence of attempts by Ramirez to purchase marijuana in 1977 and 1978, his possession of a duffel bag full of cash with traces of cocaine in early 1981, and his attempts to help a smuggler, Morris, obtain funds from the estate of another smuggler were not admissible under Rule 404(b) of the Federal Rules of Evidence to show a common plan or scheme. The indictment charged the conspiracies began in the spring of 1981. The district court allowed the evidence of the 1977 and 1978 trips to show motive, knowledge, intent, and the development of a course of conduct. The evidence was admitted to rebut Ramirez' various defenses that he was flying intelligence missions for the CIA, that he was smuggling aliens or microfilm, and that he was involved in guerilla warfare in Central America. The evidence was not so far removed in time to make it inadmissible. *See United States v. Engleman,* 648 F.2d 473, 478–79 (8th Cir. 1981). The testimony by Morris showed Moeckly's knowledge of Ramirez' activities and past activity as his copilot. Because the testimony also showed Ramirez was interested in having Morris participate in smuggling activity, the court allowed the testimony as statements in furtherance of the conspiracy. The evidence was probative and was not unduly prejudicial to Coulombe. The district court properly gave cautionary instructions that the evidence was not to be considered against defendants not involved. *See United States v. Miller,* 725 F.2d 462, 466 (8th Cir.1984). Moeckly challenges Morris' testimony, asserting it was not in furtherance of the conspiracy under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Morris' testimony about Ramirez' statements that Moeckly was familiar with the smuggling operations furthered the conspiracy by allowing Morris to deal more easily with members of the conspiracy. Morris planned to fly cover for Ramirez and delivered auxiliary fuel containers to Ramirez and Moeckly.

■ Coulombe and Moeckly challenge the district court's denial of their severance motions. Moeckly moved for severance before trial, renewed his motion during trial as evidence was admitted to which he objected, and the court made a midtrial rule denying the motion for severance. He renewed his motion after conviction. Moeckly therefore has preserved this assignment of error. Rule 8(a) of the Federal Rules of Criminal Procedure permits

joinder of offenses that are the same or of similar character or are based on the same transaction or a common scheme. Moeckly's perjury and conspiracy charges are sufficiently related because the perjury charges helped conceal his participation in the conspiracy. Proof of the smuggling flight was necessary to show Moeckly perjured himself when he testified before the grand jury that he had not been to Florida in 1983. Although Coulombe did not renew his motion for severance and preserve the objection, joinder of offenses was proper to him as well for the same reasons. The district court properly denied Moeckly's severance motion as to defendants as well because severance would have required the same proof of the smuggling conspiracies in separate trials. Generally persons charged with conspiracy are to be tried together. *United States v. Miller*, 725 F.2d 462, 467–68 (8th Cir.1984). Joinder of defendants was not unduly prejudicial.

Moeckly argues that his perjury conviction must be vacated because questions asked before the grand jury were not material to the investigation and his answers arguably were true. Perjury is defined in 18 U.S.C. § 1623 as knowingly making "any false material declarations before or ancillary to any court or grand jury" while under oath. Moeckly argues his statements were not material to the investigation because they did not tend to "influence, mislead, or hamper" the investigation. *See United States v. Lasater*, 535 F.2d 1041, 1047 (8th Cir.1976). Moeckly was convicted for testifying falsely that he did not keep a pilot's log book and that he did not recall being in Florida in 1983. The questions posed were not ambiguous and Moeckly's denials, regardless of the availability to the grand jury of accurate information through other witnesses, tended to obscure Moeckly's whereabouts at critical times during the conspiracies. *See United States v. Williams*, 552 F.2d 226, 230 (8th Cir.1977).

Moeckly asserts that he was denied due process by prosecutorial misconduct before the grand jury. When Moeckly asserted fifth amendment rights in response to inquiries, the prosecutor stated that the grand jury had the inherent authority to request the Government to investigate whether he asserted these rights frivously. Appellant notes that it is the presiding judge who determines whether the assertion is valid and can order the witness to respond or face contempt. Moeckly maintains that this statement, the prosecutor's insistence on yes or no answers to his questions, and questions about his income and legal practice, harassed and discredited him and engendered hostility by the grand jury. Moeckly's responses had been evasive to the point of asserting his fifth amendment privilege when asked whether he had been served with a subpoena. The prosecutor's insistence on direct answers and inquiries into his income were entirely permissible. The misstatement on fifth amendment rights was not unduly prejudicial. The Government informed Moeckly that he had the right not to incriminate himself and to consult with counsel outside the presence of the grand jury. Moeckly was provided with a recess to allow consultation with his attorney. Moeckly also challenges the prosecutor's inquiry whether he had spoken to particular well-known criminal defense attorneys in connection with his subpoena to testify. Such questioning is prejudicial, irrelevant, and improper. *See generally United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill.1979). The prosecutor has been admonished by this court that such questioning must not recur. In the light of the evidence before the grand jury and the limited prejudice to Moeckly's rights, however, dismissal of the indictment is not warranted. We also hold that there was no reversible error in failure to inform Moeckly that he was a target of the grand jury investigation. It was not clear that he was a target at the time of the investigation. Finally, Moeckly was not entitled to an entrapment instruction on the perjury charges. Moeckly was fully apprised that false statements exposed him to criminal penalties.

The defendants' convictions are AFFIRMED.

ARNOLD, Circuit Judge, concurring.

I join the Court's opinion, but desire to add a few words of explanation with respect to the issue of venue.

Venue in a criminal case is a constitutional right. It is also a question of fact which should be submitted to the jury. *United States v. Jackalow*, 1 Black 484, 17 L.Ed. 225 (1862); *United States v. Black Cloud*, 590 F.2d 270 (8th Cir.1979). Here, as the Court says, "[v]enue was in issue in the district court." *Ante*, at 461. Furthermore, the verdict of guilty as to the offenses charged does not, as a logical matter, necessarily include a determination that anything was done in Minnesota. *Ibid.* Therefore, "the jury should have been afforded the opportunity to make a finding of proper venue. This is not a case where proof of the charges necessarily resulted in a finding of proper venue." *Id.* at 462.

It is nevertheless true, as the Court points out, that the evidence of activities in Minnesota was overwhelming and uncontradicted. As a practical matter, the chance that this jury could have disbelieved the evidence that one or more overt acts were committed in Minnesota, while still returning a guilty verdict, approaches zero. In this situation, I believe that *United States v. Netz*, 758 F.2d 1308 (8th Cir.1985) (per curiam), requires us to affirm. There, the venue instruction proposed by the defendant did not correctly state the law, but this Court did not place its affirmance of the conviction solely on that ground. We also noted the strength of the government's evidence on the venue issue and the fact "that appellant had not disputed the government's evidence establishing venue by presenting any contrary evidence." *Id.* at 1312.

We are bound by this Court's panel decision in *Netz*. I therefore join the Court's opinion and judgment.