**UNITED STATES of America, Appellee,**

v.

**Bayard SPECTOR, Appellant.**

**No. 84–2493.**

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1986.

Decided June 16, 1986.

Rehearing and Rehearing En Banc Denied July 15, 1986.

---

Irl B. Baris, St. Louis, Mo., for appellant.

Debra E. Herzog, Asst. U.S. Attys., St. Louis, Mo., for appellee.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOODS,* District Judge.

HENRY WOODS, District Judge.

Bayard Spector appeals from a conviction following a jury trial on charges involving a conspiracy to distribute cocaine.[1] For reversal, Spector argues that the district court[2]: (1) erred in submitting the case to the jury on a single conspiracy theory; (2) erred in submitting the alleged violation of the Travel Act (18 U.S.C. § 1952) to the jury; (3) violated his fifth amendment right of due process by allowing testimony of a government informer; (4) violated his sixth amendment right of confrontation by restricting cross-examination of the government informer; and (5) erred in refusing to instruct the jury regarding the testimony of alleged perjurers. We affirm.

George Kelly, Jr., a co-defendant who pleaded guilty to the conspiracy, testified he approached Spector in April, 1984 about serving as one of the principal suppliers of 25 kilos of cocaine which were to be delivered to purchasers in the St. Louis area every six weeks at $50,000 a kilo. Kelly had previously approached a drug dealer named Bruce Cohen (also indicted in this conspiracy but presently a fugitive) about supplying the entire amount. Cohen wanted a $200,000 deposit which the St. Louis contact was unwilling to furnish.

Unbeknownst to Kelly, the St. Louis contact was a DEA informant named Joe Adams. Adams had been apprehended in connection with drug transactions and through his attorney had entered into a written agreement with the government to cooperate in the investigation of drug trafficking. In return the government gave Adams, his family, and his girl friend use immunity and agreed not to prosecute his family or girl friend for past crimes. The agreement contained the following provision concerning Adams:

The Government will carefully and in good faith consider and evaluate Mr. Adams' cooperation and the information he provides in making its determination whether or not to reduce or forgo [sic] some or all of the aforesaid maximum charges and imprisonment exposure. In short, this Office will review in good faith the extent and value of Mr. Adams' information and cooperation as it relates to successfully solving and prosecuting crimes. The more important we deem that information and cooperation, the more likely the reduction of charges and his sentencing risk.

(Appellant's brief at Appendix 2). In no event was Adams to be indicted for crimes carrying punishments totaling more than 45 years.

According to the testimony, Adams went to Miami and interested Kelly in the St. Louis deal. After Cohen reneged on supplying all the cocaine without the above-mentioned deposit (Cohen did agree to furnish two kilos), Kelly approached Spector.

---

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. Spector was convicted on two counts: one of conspiring to distribute and possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846; and one of traveling in interstate commerce to promote this activity in violation of 18 U.S.C. § 1952(a). He was sentenced to eleven years on the conspiracy count and five years on the travel count to be served concurrently.

2. The Honorable Edward L. Filippine, United States District Court for the Eastern District of Missouri.

Spector initially agreed to furnish the entire amount but later reduced his commitment to five kilos. Co-defendants Phil Rima and Vinson Rood were contacted by Kelly and they agreed to furnish small amounts of cocaine for the St. Louis deal. Part of the cocaine was to be driven to the Ramada Inn across the river in Illinois; the rest was to be brought by the suppliers to the Marriott Hotel in St. Louis where they would meet and complete the transaction. Vinson Rood stayed at the Ramada with the cocaine supplied by Rima and Cohen. Kelly, Adams, Rima, and Spector met at the Marriott Hotel on Tuesday, May 1, 1984.

Upon entering the hotel suite, Spector immediately pulled Rima into a side bedroom and asked if everything was okay, if it was a setup, and if the room was bugged. Then they returned to the main room and discussed with the others how the deal would take place. Spector wanted to see Rima paid first and leave with his money. Rima, Kelly, and Adams all testified that Spector expressed a desire at the time to be a part of future deals. Shortly thereafter Spector saw a transmitter in the pocket of Adams' jacket and ran from the room. He was arrested soon after he left the hotel. No cocaine was found on his person or in his hotel room. Kelly and Rima testified against the appellant who did not take the stand. They pled guilty to one count each as did Rood. In Spector's favor, an official employed by Monsanto testified he had an appointment to see Spector on business in St. Louis on May 2, 1984.

These facts provided the basis for the three count indictment and Spector was convicted by a jury on two counts. This appeal followed.

## I.

Appellant claims the district court erred in submitting the case to the jury on a single conspiracy theory since the evidence disclosed multiple conspiracies. If multiple conspiracies were proved, it is true that an accused's rights may be affected by the introduction of evidence of crimes unrelated to the defendant. *See United States v. Jackson*, 696 F.2d 578 (8th Cir. 1982), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). Appellant relies on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) to support his multiple conspiracy argument. A single quotation from that case shows that it is inapposite. "We do not think that either Congress ... or this Court ... intended to authorize the Government to string together for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." *Id.* at 773, 66 S.Ct. at 1252.

No such groupings of multiple conspiracies existed here. There was a single conspiracy to periodically introduce a large quantity of cocaine into the St. Louis area. The fact that the individual defendants agreed to contribute a portion of the total quantity to the suppliers did not convert the conspiracy from single to multiple status. The fact "that a number of separate transactions may have been involved ... does not establish the existence of a number of separate conspiracies." *United States v. Brewer*, 630 F.2d 795, at 799, *citing United States v. Parnell*, 581 F.2d 1374, 1382 (10th Cir.1978), *cert. denied, sub nom., Cox v. United States*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979).

In *United States v. Standridge*, 770 F.2d 744 (8th Cir.1985), this court rejected an argument similar to that made by appellant herein. "[A]t the time this operation was commenced by Woody Standridge, the objectives of the operation were to produce ... counterfeit twenty-dollar bills. Those objectives did not change when ... defendants joined the scheme by providing operating capital." *Id.* at 746. The court went on to quote from *United States v. DeLuna*, 763 F.2d 897, 918 (8th Cir.1985) as follows: "To resolve the question of whether the government's proof showed that one or multiple conspiracies existed, we must de-

termine 'whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy.' " 770 F.2d at 746 (citations omitted). Here the conspirators sought to furnish 25 kilos of cocaine to the St. Louis buyer every six weeks and agreed to individual participation in that plan. Appellant's multiple conspiracy argument, therefore, is devoid of merit.

## II.

■ Appellant contends there was no illegal business enterprise or continuous course of conduct as required by the Travel Act, 18 U.S.C. § 1952 (1982). However testimony established that appellant had been involved in a previous drug deal with George Kelly, that he was deeply involved in the present deal, and that he wanted to be included in future drug trafficking in the St. Louis area. Spector traveled from Florida to St. Louis not only to effectuate the present drug deal but to solidify his part in future deals in the St. Louis area. Without question there was ample evidence to sustain a Travel Act conviction. *See, e.g., United States v. Krevsky*, 741 F.2d 1090 (8th Cir.1984) (evidence of past and future plans for the distribution of drugs and of an ongoing enterprise involving the distribution of drugs was sufficient to establish that the conspiracy charge was not just an isolated incident and was instead a continuous course of conduct). *See also United States v. Davis*, 666 F.2d 195 (5th Cir.1982).

■ Appellant also claims there was no overt act in furtherance of the enterprise. Such a contention overlooks the fact that Spector traveled from Florida to Missouri where he met with his co-conspirators and engaged in negotiations related to the instant sale as well as future transactions. *See United States v. Tavelman*, 650 F.2d 1133 (9th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982) (holding that a continuous enterprise and one act in furtherance thereof is all that is required to support a Travel Act conviction). We hold there was sufficient evidence to support the jury verdict on the Travel Act count.

## III.

■ The appellant strongly urges that the written agreement between the government and Adams violated his right of due process. However, Adams' testimony had very little to do with the conviction of Spector. The most damaging testimony was given by Kelly and Rima, his co-defendants. The conspiracy was far advanced before Adams laid eyes on Spector in the short meeting at the Marriott Hotel in St. Louis. Spector's dealings were almost entirely with Kelly, not with Adams. As this court said about a similar claim on an alleged contingent agreement with a witness, the appellant "failed to demonstrate how [the informant's] testimony was critical to his conviction." *United States v. Fazzino*, 765 F.2d 125, 126 (8th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985).

Appellant in his due process argument relies heavily on the panel decision in *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984). However, that decision has no precedential value since it was vacated in an *en banc* decision affirming the district court by an evenly divided 4–4 vote. *United States v. Fazzino*, 765 F.2d 125 (8th Cir.1985), *citing United States v. Dailey*, 759 F.2d 192 (1st Cir.1985).

In the *Fazzino* case this court rejected a due process argument involving a witness under investigation for mail fraud who allegedly cooperated with the government pursuant to a "de facto contingency agreement" whereby the outcome of any criminal prosecution against the witness would depend on the quality of the evidence he obtained against Fazzino.

■ What was said about the lack of factual similarities between *Waterman* and *Fazzino* is equally true of *Waterman* and the present case. The plea agreement in *Waterman* included a government promise to recommend a two-year reduction in the accomplice's sentence if his "truthful testi-

mony led to further indictments." 732 F.2d at 1530. The agreement herein spoke in terms of "solving and prosecuting crimes." It should be noted that in *Dailey, supra,* "the district court characterized the contingency involved here as the achievement of successful prosecutions." 759 F.2d at 197. If we consult *Dailey* because of the factual similarities and this court's reliance upon it in *Fazzino,* we find an exhaustive review of authorities upholding contingency agreements similar to that made with Joe Adams.[3] Of particular relevancy is the case of *United States v. Kimble,* 719 F.2d 1253 (5th Cir.1983), *cert. denied* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) where an accomplice pled guilty and agreed to testify with the understanding that he would be sentenced to 20 years imprisonment if his cooperation was considered adequate. The Court of Appeals for the Fifth Circuit held the existence of the plea agreement affected the weight of the testimony and not its admissibility.

Since its decision in *Fazzino, supra,* this court decided *United States v. Moeckly,* 769 F.2d 453 (8th Cir.1985) where the testimony of a witness was attacked because "he testified pursuant to a plea bargain and feared prosecution." *Id.* at 462. This court rejected such a basis for exclusory testimony but pointed out that these circumstances could be used for impeachment on cross-examination. The court pointed out in *Moeckly* that there was an abundance of other evidence to establish the conspiracy and Moeckly's awareness of its "essential object." *Id.* at 463. In the present case Adams was extensively cross-examined about his past history and his agreement with the government. The same is true of the case against Spector. Even if Adams had not taken the stand, the government had a strong and persuasive case against Spector.

## IV.

The appellant contends that his sixth amendment right of confrontation was violated when the district court refused to compel Joe Adams, the informant, to give his address in open court. He relies on *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). In that case, however, the witness failed to give both his correct name and his address. We agree with the following reasoning in *United States v. Teller,* 412 F.2d 374, 380 (7th Cir.1969), *cert. denied,* 402 U.S. 949, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971):

> *Smith* does not per se require a new trial merely because the district court sustained an objection to a question seeking to elicit Washington's address. *Smith* requires reversal only where the lack of a witness's name and address denies a defendant an opportunity to effectively cross-examine a witness. When this happens, a defendant is denied his Sixth Amendment right to confrontation. However, the initial question is whether the defendant was denied effective cross-examination. It is clear from the recital of Washington's testimony that the district court did not unduly limit cross-examination of Washington's past record.

---

3. The informant's anticipated receipt of $1,000, if his testimony resulted in a conviction, did not render him incompetent to testify. *United States v. Valle-Ferrer,* 739 F.2d 545, 549 (11th Cir.1984). Testimony of an accomplice who had been the beneficiary of a generous plea agreement was admitted, even though he was a thief, perjurer, and convicted felon. *United States v. Miceli,* 446 F.2d 256 (1st Cir.1971). Testimony of an unsentenced accomplice who had pled guilty was permitted in *United States v. Borman,* 437 F.2d 44 (2d Cir.1971), *cert. denied,* 402 U.S. 913, 91 S.Ct. 1394, 28 L.Ed.2d 655 (1971). In *Heard v. United States,* 414 F.2d 884 (5th Cir.1969), the court approved the admission of testimony from an informant who was a convicted felon and who had been paid for results rather than information. Testimony of an undercover agent was allowed even though the amount of compensation was to be determined after trial "on basis of an appraisal of extent and quality of [their] work." *United States v. Crim,* 340 F.2d 989, 990 (4th Cir.1965). "[A] conviction may be based on the uncorroborated testimony of an accomplice ... even though the accomplice is in a position to gain favors from the government by his testimony." *Lyda v. United States,* 321 F.2d 788, 794 (9th Cir.1963).

Here as in *Teller* the witness was cross-examined in great detail. He testified as to his current residence in St. Louis County, that he had lived off and on in Miami, Florida since 1973. He admitted to being a drug dealer and body guard for drug dealers. A review of the wide-ranging cross-examination of Adams disclosed an extensive knowledge of his background. Appellant clearly had ample opportunity to identify this witness with his environment. In *United States v. Mesa*, 660 F.2d 1070, 1075 (5th Cir.1981), the court made the following comment which is applicable herein: "The critical question in deciding if a witness must divulge his address is whether or not the defendant has been given sufficient opportunity to place the witness in his proper setting. This determination is committed to the sound discretion of the trial court." *Id.* at 1075 (citations omitted). For a similar holding, *see United States v. Smaldone*, 484 F.2d 311 (10th Cir.1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974).

Appellant has failed to demonstrate prejudice in the court's refusal to require Adams to divulge his address in open court. Government counsel offered to provide the information privately, but defense counsel did not take advantage of the offer. (T. Vol. 3, p. 96).

In holding that the right to ask a witness to give his address was not absolute, this court in *Caldwell v. State of Minnesota*, 536 F.2d 272, 274 (8th Cir.1976) made the following significant statement:

> The record in this case contains evidence that disclosure of Klabunde's address and place of employment might have posed a threat to his safety. It also reveals that Caldwell had an ample opportunity to place Klabunde in his proper environment so that the jury might evaluate his testimony. Caldwell has asserted no particularized need for the disclosure of Klabunde's residence and workplace. Under these circumstances, we hold that he was not denied this right to confrontation.

In view of the circumstances surrounding the testimony of Adams and the full content of his testimony, the trial judge did not abuse his discretion in refusing to force Adams to divulge his current address in open court.

## V.

Appellant makes other arguments which may be treated summarily. During the course of Adams' cross-examination, it was revealed that Adams had made some tapes at the direction of his attorney to assist the latter in his representation of Adams as a potential defendant. Government counsel did not know the contents of those tapes, had never had them in their possession, and strongly deny they ever knew such tapes existed prior to the cross-examination of Adams. The tapes were sealed at the office of Adams' attorney. There is no indication of an intention that these tapes be disclosed to a third party.

As was recognized in *United States v. (Under Seal)*, 748 F.2d 871 (4th Cir. 1984), the attorney-client privilege protects "communications not intended to be disclosed to third persons other than in the course of rendering legal service to the client." *Id.* at 874. The court relied on Supreme Court Standard 503(a)(4), which states in pertinent part: "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client." Although Congress did not adopt this rule, courts have relied upon it as an accurate definition of the federal common law of attorney-client privilege, as this court specifically noted in *Citibank, N.A. v. Andros*, 666 F.2d 1192, 1193 n. 6 (8th Cir.1981). "Consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts." 2 J. Weinstein, *Evidence* ¶ 503[02] at 503–17 (1975). The trial court did not err in quashing the subpoena for the sealed tapes in the possession of Adams' attorney.

Appellant claims error in the refusal of the court to instruct that "the testimony of an admitted perjurer should always be considered with caution and weighed with great care." This requested instruction was based upon a Florida statute § 837.05 reading as follows: "Whoever knowingly gives false information to any law enforcement officer concerning the alleged commission of any crime is guilty of a misdemeanor of the first degree, punishable as provided in § 772.082, § 775,083, or § 775.-084." Kelly and Rima admitted to having told untruths to Florida law enforcement officials. Although it is compiled under the "perjury" chapter of the Florida statutes, the statute does not state that this misdemeanor offense constitutes perjury. There is no comparable federal statute or Missouri statute. The witnesses were not charged in Florida with its violation. This is a matter of credibility for the jury to consider and we find no error in the court's refusal to give the proffered instruction.

Appellant also claims that his counsel should have been permitted to question Adams about other investigations unrelated to the instant conspiracy. Clearly, the imposition of such a restriction was within the discretion of the trial judge. Cross-examination of Adams was broad and free-wheeling. The trial court had not only the right but the duty to keep it within reasonable bounds.

We affirm the judgment of conviction.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. I believe that Spector's right to due process was violated by the government's use of a witness whose agreement with the government was contingent upon the successful prosecution of crimes, and by the government's failure to produce Jencks material.

Although an agreement granting government favors to a prosecution witness in return for truthful testimony is not *per se* improper, *see United States v. Librach,* 536 F.2d 1228, 1230 (8th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976), there must be some limits to the scope of such agreements. In 1962, the Fifth Circuit held that without some "justification or explanation, we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed." *Williamson v. United States,* 311 F.2d 441, 444 (5th Cir.1962). Judge John R. Brown stated in his concurrence that "[w]hat we hold is that, recognized as is the role of informer in the enforcement of criminal laws, there comes a time when enough is more than enough—it is just too much." *Id.* at 445 (Brown, J., concurring specially). I believe that the government's contingent agreement with Adams was "just too much."

In *United States v. Waterman,* 732 F.2d 1527 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985), a panel of this Court held that the government cannot offer favorable treatment to a witness contingent upon the success of prosecution. Although this Court, sitting *en banc,* vacated that decision, we, "by ultimately dividing evenly, * * * served notice that benefits made contingent upon subsequent indictments or convictions skate very close to, if indeed they do not cross, the limits imposed by the due process clause." *United States v. Dailey,* 759 F.2d 192, 201 n. 9 (1st Cir.1985).

In the case now before us, however, it is apparent that the government has decided not to heed this notice, as its arrangement with Adams went even further than the one in *Waterman.* In *Waterman,* the government's witness only provided testimony regarding accomplished facts, whereas, in this case, Adams not only testified regarding accomplished facts, but also set up the underlying criminal activities.[1] Ad-

---

1. The panel in *Waterman* pointed out that it was not faced with the situation of a paid informant who might be more likely to entrap a defendant because of the contingent nature of her or his compensation. Nor do the facts before us resemble government participation in illegal activity with a defendant prior to trial through undercover agents or paid infor-

ditionally, the interest Adams had in Spector's conviction was much greater than the witness's interest in *Waterman.* In the latter case, the witness agreed to testify in return for a mere recommendation of a two-year sentence reduction. In this case, in exchange for him "providing truthful information to and complete cooperation with United States law enforcement agencies in any matter in which he is asked about," the government agreed to provide immunity for Adams, his parents, his children, and his girlfriend from criminal charges arising out of information Adams provided or out of any other investigations currently being conducted. The government also agreed to limit Adams's maximum penalty exposure for indictments arising from current or previous investigations to forty-five years.[2] Most importantly, the government stated that it would consider reducing or foregoing entirely even this limited exposure after reviewing "the extent and value of Mr. Adams' information and cooperation as it relates to *successfully solving and prosecuting crimes.* The more important we deem that information and cooperation, the more likely the reduc-

tion of charges and his sentencing risk."[3] Tr. at 3–42 (emphasis added). I, along with the First Circuit, "can think of no instance in which the government would be justified in making a promised benefit contingent upon the return of an indictment or a guilty verdict." *See Dailey,* 759 F.2d at 201.

Given the serious credibility questions raised by the contingent nature of Adams's agreement with the government, it is especially troubling that Spector was denied access to the taped diaries Adams made of his activities for the government.

In my opinion, the tapes were Jencks material. The district court, after an in camera review of one of the tapes, stated that "[t]he tape has been turned over in its entirety as Jencks material of the witness Adams." Tr. at 3–11. There was apparently nothing to distinguish the tape turned over to Spector from the other tapes. The tape produced was, like the others, a daily diary of Adams's activities on the government's behalf. It was neither the first nor the last tape made. The only difference appears to be that, although the government knew Adams was recording a daily

mants which, although not technically entrapment, is so outrageous as to deny the defendant due process of law.
*Waterman,* 732 F.2d at 1530 (citations omitted).

2. The government agreed to limit any indictments to:
1) Two charges of violating 21 U.S.C. § 841(a), with a maximum exposure of fifteen years per charge. (The usual exposure for a violation of this statute forbidding persons to manufacture, distribute, or dispense, or to possess with intent to manufacture distribute, or dispense a controlled substance would be up to twenty years imprisonment or a fine of $250,000, or both. *See* 21 U.S.C. § 841(b).)
2) A maximum exposure of ten years for any charges under 26 U.S.C. §§ 7201 (tax evasion) or 7206(1) (perjury). (The standard exposure for a violation of § 7201 is not more than five years or a fine of not more than $100,000, or both. The standard exposure for a violation of § 7206(1) is up to three years or up to $100,000, or both.)
3) A maximum exposure of five years for any charges brought within the above indictments pursuant to Title 31 (Money and Finance). The fact that limiting his criminal exposure to forty-five years could be considered a bargain is

not surprising considering Adams's recent activities. Adams testified that he had been working as a "collector" and bodyguard for drug dealers. He stated:
Specifically I was a man tracker and investigator. If they had a collection problem where somebody might have skipped town without paying for a large amount of drugs or their life was in a situation due to the drug wars among themselves, I would handle the investigation myself, track down the people all over the country and provide security also in Miami in case there was a life threat by the dealers.
Tr. at 3–33.
He also admitted that he bought and sold cocaine himself.

3. Although the agreement required Adams to provide only truthful information, this requirement was largely meaningless considering the great incentive to fabricate evidence. Additionally, there were, practically speaking, no real means of verification—the corroborating witnesses were required under their own plea agreements to cooperate with the prosecution.

diary,[4] *see* Tr. at 3–123, it only requested the tape containing a particular telephone conversation between Adams and Kelly. *See* Tr. at 3–10.

The government argues that the attorney-client privilege shields the tapes from production, in spite of the fact that it admitted the "possibility that the tapes would be disclosed" to the government, Brief of Appellee at 25, and that one, in fact, has been disclosed. As the government acknowledges,

> A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client.

*Id.*

Although Adams claimed that he did not know why he was recording the diaries, his testimony made the purpose apparent:

> Q. Would it be fair to say that during this investigation and work that you were doing, that you were very, very concerned that you'd get full credit for all the—for successfully solving crimes? You didn't want to solve a crime that you didn't get credit for so you—somehow you would report it, didn't you, as soon as you did something?
>
> A. Oh, yes.
>
> Q. Didn't you keep a personal log of this, because you probably couldn't trust the government necessarily?
>
> A. I don't trust the government, I trust Tom Dittmeier.

Tr. at 3–118.

Even if the tapes were originally protected by the attorney-client privilege, any privilege was waived when Adams told the government about the tapes and delivered one to it. In *United States v. Cote*, 456 F.2d 142 (8th Cir.1972), this Court stated:

> Notwithstanding our recognition that the attorney-client privilege attached to the information contained in the accountant's workpapers under the circumstances existing here, we find that by filing the amended returns the taxpayers communicated, at least in part, the substance of that information to the government, and they must now disclose the detail underlying the reported data. A client may waive the privilege which protects what he earlier confided to his attorney or his attorney to him. See 8 Wigmore, Evidence § 2327 (McNaughton Rev. 1961). Here, Cote, the accountant, testified that the information on his workpapers was later transcribed onto the amended returns which were filed by the taxpayers with the government. This disclosure effectively waived the privilege not only to the transmitted data but also as to the details underlying that information. As stated in *United States v. Tellier*, 255 F.2d 441, 448 (2 Cir.1958), cert. denied, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62: "[T]he privilege attaches to the substance of a communication and not to the particular words used to express the communication's content." See also *United States v. Shibley*, 112 F.Supp. 734, 742 (S.D.Cal.1953). Cf. Rule 5–11, Proposed Rules of Evidence, supra note 2 [disclosure of "any significant part" of a communication waives the privilege]; 8 Wigmore, supra, § 2327 at 638 [the "doctrine of completeness" is analogous to this principle]; McCormick, Law of Evidence § 93 (1954).

*Cote*, 456 F.2d at 144–45 (footnotes omitted).

---

**4.** It is interesting to note that in spite of the fact that Adams testified that the government's agents knew during the investigation that he had been taping daily notes, the government claims to have only found out about the tapes "[d]uring the course of Adams' cross-examination." Brief of Appellee at 22. This claim would not explain how the government obtained the one tape. Either the government asked Adams for the tape, or Adams handed it over out of the blue. If the former were the case, the government would have had prior knowledge of that tape and, presumably, of the others. If Adams just handed them the tape, it only seems logical that the government would have asked why it had been made and would have learned of the others.

Adams's testimony also disposes of the government's argument that the tapes are not within the Jencks Act because Adams's diary was "not disclosed to government agents and attorneys." *Id.* at 24.

Even assuming, arguendo, that the tapes were privileged, and that there was no waiver, I would reverse on this issue. "It is clear that government witnesses have a right to assert the attorney-client privilege on cross-examination. However, where assertion of the privilege unduly restricts a defendant's cross-examination, the witness' direct testimony may have to be stricken." *United States v. Coven*, 662 F.2d 162, 170–71 (2d Cir.1981) (citations omitted), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982).

I believe that Adams's testimony should not have been allowed under any circumstances, given the great incentive to fabricate evidence that the contingent agreement provided. To compound this failure, the district court severely restricted Spector's ability to attack Adams's credibility on cross-examination, by denying access to tapes which dealt with the exact matters about which Adams testified. Accordingly, I would reverse.